Hotten, J.
The case at bar is an interlocutory appeal filed by the State[1] from an Order in the Circuit Court for Dorchester County, granting Terrance J. Brown’s motion to suppress statements obtained in violation of Miranda v. Arizona, 384 U.S. 486, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court of Special Appeals, in an unreported opinion, reversed. We granted Brown’s petition for writ of certiorari, and after briefing and argument, ordered that this matter be remanded, without affirmance or reversal, to the suppression court for the sole purpose of the entry of findings of fact on the issue of custody. After receipt of the suppression court’s findings, supplemental briefing, and reargument, we consider one question—whether Brown was in custody for Miranda purposes during the interrogation that took place at the Cambridge Police Department before Brown was provided with Miranda warnings. We shall hold that a reasonable person in Brown’s circumstances would not have felt free to terminate the interrogation and leave. The totality of the circumstances demonstrated that the restraint on Brown’s freedom of movement was to the degree associated with a formal arrest. Further, Brown was subjected to an environment that contained the inherently compelling pressures of custodial interrogation, which powered the Supreme Court’s decision in Miranda. Thus, Brown was in custody for purposes of Miranda during the time period at issue. The trial court properly suppressed Brown’s statements.
*201 I. FACTS AND PROCEDURAL HISTORY
Brown was charged with two counts of first-degree murder and related charges in the Circuit Court for Dorches-ter County. The charges stemmed from a shooting that occurred outside the Elks Lodge in Cambridge, Maryland during the early morning hours of October 5, 2014. Later that day, Brown made statements to police during an interrogation at the Cambridge Police Department. Brown filed a motion to suppress those statements. At the suppression hearing, Trooper Greg Fellon, Detective Edward Howard, and Detective Chris Flynn testified for the State. Brown did not testify and called no witnesses. The factual background that follows is derived from the suppression court’s factual findings, together with reference to undisputed evidence presented at the suppression hearing.[2]
During the early morning hours of October 5, 2014, Trooper Fellon was on routine patrol and monitoring radio traffic dispatches. He learned of a reported shooting at the Elks Lodge in Cambridge. At 1:06 a.m., a Dorchester County dispatch broadcasted that an unknown male in an unknown vehicle had called 911. The unknown male stated on the 911 call that he was injured, driving from Cambridge to Hurlock Village Apartments, and he “didn’t want to go to jail.”[3]
Trooper Fellon established an observation position near Hurlock Village Apartments. Trooper Fellon observed “what he believed to be the vehicle of interest[.j” Trooper Fellon *202 observed a man exit that vehicle. After the man left Trooper Fellon’s line of vision, Trooper Fellon approached the car and initiated contact with the three remaining passengers in the car. When one of the occupants opened the passenger side door, Trooper Fellon testified that he observed dried blood in the passenger area.
Trooper Fellon asked the occupants about the man who had previously exited the car. Trooper Fellon testified that the occupants replied that they had gone to Cambridge to “pick up T. J. Brown and bring him home to his mother’s [house]” in the Hurlock Village complex.
Two additional Maryland State Police Troopers and a Dor-chester County Deputy arrived at the scene. Thereafter, Brown’s mother drove into the complex. Trooper Fellon requested that she ask her son to come outside to speak with him. She agreed, and Brown came outside. Trooper Fellon observed that Brown was wearing a shirt with blood on it, and he had blood dripping from his earlobe. Brown told Trooper Fellon that “he had been at a party in Cambridge when he heard gunshots. Upon hearing the gqnshots ... he began to duck and run.” The police officers summoned emergency medical personnel to the scene. Regarding his observations of Brown’s gunshot wounds, Trooper Fellon testified that Brown “had a nick to his earlobe[,]” “a graze to his shoulder blade area and what appeared to be like a through and through [gunshot wound] on ... his upper chest.”
At approximately 1:55 a.m., Brown was transported from Hurlock to Peninsula Regional Medical Center in Salisbury, Maryland for treatment. The information gained during the course of Trooper Fellon’s investigation, including that Brown was struck by gunfire, was communicated to members of the Cambridge Police Department. Trooper Fellon was then advised that the Cambridge Police Department had arranged for a tow truck to pick up Brown’s vehicle. Within twenty minutes of Brown’s transport to the hospital, the tow truck arrived and removed the vehicle to the police station. “At the request of superiors, Detective Howard of the Cambridge Police Depart *203 ment traveled to Peninsula Regional Medical Center[]” to meet with Brown, who was awaiting discharge.
Detective Howard arrived at the hospital at approximately 5:40 a.m. Detective Howard testified that he “advised [Brown] that the lead investigator Detective Flynn was interested in obtaining his story for his side of the events being he was a victim of that shooting.” The suppression court noted that Detective Howard further “advised [Brown] that his purpose [at the hospital] was to ‘obtain’ ” Brown “and ask him if he would consent to coming back” to the Cambridge Police Department “to ‘get[]’ a statement.” Detective Howard’s badge and weapon were visible and his gun was secure throughout the interaction.
Detective Howard transported Brown in a marked police car directly from the hospital to the Cambridge Police Department. Brown was seated in the rear passenger seat. Brown was not handcuffed. He was wearing disposable shirt-and-pants hospital scrubs and boots. His head was bandaged.
The suppression court found that “Detective Howard advised [Brown] numerous times that he was not under arrest, but never advised him that he was free to refuse transportation back to the Cambridge Police Department.” The court further stated:
Although [Brown] acquiesced to traveling back to Cambridge and at no time articulated that he did not want to go, he did express concern about how he would get home, especially after being advised once he was in the police car that his vehicle had been taken to the Cambridge Police Department after Tpr. Fellon found blood in the vehicle. Detective Howard assured [Brown] that the proper arrangements would be made.
Upon arrival at the police department, Detective Howard entered through a door in the north tower located “apart from the entrance for the general public. Detectives Flynn and Curran were waiting for Detective Howard and [Brown] on the second floor.” Brown was then taken to an interview/inter *204 rogation room. The suppression court described the interview/interrogation room:
[Brown] was seated in an interview/interrogation room which is located on the second floor of the Cambridge Police Department adjacent to the Criminal Investigation Division office area. The interrogation rooms are equipped with both audio and video recording.... The interview room is situated such that there is no view outside of the police headquarters and it is not easy to traverse from that location to the outside without guidance and in some instances the use of electronic access devices.
The door to the interview room was closed except when police personnel entered and exited the room. The suppression court found that “[Brown] was left alone in the room for approximately 15 minutes before Detective Flynn appeared for the interview." Detective Flynn was the sole interviewer. The suppression court noted that “[a]t no time from the beginning of the interview until [Brown] was told he was being arrested for homicide was he told that he was free to leave.” The interview was video-taped and transcribed.
Eventually, Brown was issued Miranda warnings and provided a written statement. Relevant here is the exchange between Detective Flynn and Brown that occurred during the approximately six minutes of interrogation[4] that preceded the detective’s issuance of Miranda warnings.[5]
*205 Detective Flynn began the interrogation by seeking Brown’s side of the story:
Do you know why you’re here? Obviously you’re here, right? I just got to get your end—your side of the story of what happened, how you got involved—do you know what I’m saying—what went on. So just start (inaudible)—start at the beginning and walk me through it.
In response, Brown placed himself at the crime scene: “I’m outside chilling outside the Elks.” He added that he heard “[ajbout six or seven” shots; the shots were “hitting where [he] was at[ ]”; and he “got the hell out of there[,j” realizing once he was in his car that he had been shot. Detective Flynn then asked: “So where did you—which way did you run after this whole thing?” Brown responded: “Well, I was parked—I ran directly towards my car where my car was parked (inaudible) shooting. I was going towards the Legion where the little church is at behind the pool hall.” Detective Flynn asked, “So you ran towards Cross Street?” and Brown replied, “Yeah. I got in my car.” Detective Flynn asked, ‘You got in your car, and then you what, drove yourself to Hurlock?” And again Brown responded, ‘Yeah.” Detective Flynn then asked: “And sometime along that [ride]—did you call the ambulance yourself, or how did that work?” Brown answered, ‘Yeah. I called them myself because I didn’t know if I was going to initially make it to Hurlock.”
Detective Flynn testified that, at that point, he viewed Brown as a suspect and decided to issue Miranda warnings. When Detective Flynn told Brown that he would be advising him of his rights, Brown asked, “What, I’m under arrest?” and Detective Flynn replied, “No. You’re not under arrest.” After the warnings were issued, Brown asked multiple times if he could go home and stated that he was tired.
Based on the above, the suppression court made second-level, “[djispositional” findings:
*206 Because [Brown], who at the very least was a person of interest in the homicide, was met by a police officer immediately upon his discharge from the hospital, placed in the backseat of a police car, delivered to police headquarters, placed in an isolated interrogation room on the second floor inside the building and never advised he was free to leave, and had no apparent means to leave, the Court finds that in light of the totality of the circumstances, a reasonable person in [Brown’s] position would not have felt at liberty to leave and thus was in custody.
The suppression court did not discredit any part of the detectives’ testimony and none of the court’s findings of fact depart in any material way from their testimony.
The State appealed the circuit court’s grant of Brown’s motion to suppress statements. On direct appeal in the Court of Special Appeals, the State argued that the suppression court erred in granting suppression of the statements Brown made to Detective Flynn before the detective advised him of his Miranda rights.[6] The State contended that the suppression court had incorrectly determined that, from the outset of the interrogation, Brown was in custody for purposes of Miranda. The Court of Special Appeals agreed and reversed the ruling of the suppression court in an unreported opinion.
Brown filed a petition for writ of certiorari, posing the following questions for our review:
1. Pursuant to the “supplemental rule of interpretation,” where a motions court makes a legal determination, such as finding custodial interrogation took place, -without making factual findings, must an appellate court fill in the fact-finding gaps by giving little or no weight to the losing party’s evidence, discrediting the losing party’s witnesses, *207 and resolving any ambiguities and drawing all inferences in favor of the prevailing party?
2. In reversing a suppression ruling, may an appellate court rely on a fact on which conflicting evidence was presented below or must the court accept the version of facts most favorable to the prevailing party?
3. What effect does a motions judge’s failure to make factual findings to support its legal conclusion that custodial interrogation took place have on the parameters of the appellate court’s review where conflicting versions of events necessitating factual findings were not presented at the motions hearing?
4. Did the intermediate appellate court err in reversing the motions court’s granting of petitioner’s suppression motion by finding that petitioner was not in custody for purposes of Miranda where, after being awake all night, petitioner was taken from the hospital in hospital garb with his head bandaged and complaining of pain from four gunshot wounds directly to the police department by an armed detective who testified that petitioner did not “put up a fight or refuse to come” in the back seat of a marked police car where petitioner was told that his car had been towed to the police station because there was blood in it, petitioner was never told that he was free to leave, he was delivered to a door to the police station that leads directly to an interrogation room with two-way glass rather than through the front door of the station, he was interrogated with an accusatory tone from the outset that leaves no doubt that the detective viewed him as a suspect, and he was arrested at the conclusion of the interrogation?
(footnotes omitted). We granted the petition and agreed to consider all four questions. Brown v. State, 445 Md. 125, 126 A.3d 3 (2015).
We considered oral arguments on March 31, 2016. On April 4, 2016, we issued an Order of Remand for the suppression court to render findings of fact regarding whether Brown was in custody for purposes of Miranda during the interrogation *208 before Detective Flynn provided Brown with Miranda warnings. We also directed the parties to submit supplemental briefs on the custody issue following this Court’s receipt of the suppression court’s findings of fact. On May 4, 2016, the Circuit Court for Dorchester County issued written findings of fact. The parties filed supplemental briefs in light of those findings, and we heard reargument on October 13, 2016.
Because the suppression court has now issued findings of fact, the first three questions presented, upon which we granted review, are moot. We therefore address only whether Brown was in Miranda custody during all or any portion of the six minutes that elapsed between the beginning of the interrogation and the point at which he was given the Miranda advisements. For the reasons that follow, we hold that Brown was in custody for purposes of Miranda for the entirety of the interrogation that preceded Miranda warnings. Thus, the circuit court did not err in granting Brown’s motion to suppress his statements made to police. Accordingly, we reverse the judgment of the Court of Special Appeals.
II. STANDARD OF REVIEW
In conducting our review of the suppression court’s grant of Brown’s motion to suppress, “we view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion,” here, Brown. Lee v. State, 418 Md. 136, 148, 12 A.3d 1238, 1245-46 (2011) (citation omitted). We accept the suppression court’s first-level findings unless they are shown to be clearly erroneous. Md. Rule 8-131(c). “We, however, make our own independent constitutional appraisal, by reviewing the relevant law and applying it to the facts and circumstances of this case.” State v. Luckett, 413 Md. 360, 375 n. 3, 993 A.2d 25, 33 n. 3 (2010) (citation and quotation marks omitted).
III. DISCUSSION
In its seminal decision in Miranda v. Arizona, the Supreme Court held that an individual in custody must be informed of *209 certain rights prior to being interrogated so that he or she is not compelled to incriminate himself or herself in violation of the Fifth Amendment. 384 U.S. 436, 467-68, 86 S.Ct. 1602, 1624-25, 16 L.Ed.2d 694 (1966). The State does not dispute the fact that the statements at issue before us—those that Brown made to Detective Flynn during the six minutes before the detective advised him of his Miranda rights—were the product of interrogation. Thus, the issue before this Court is whether Brown was in custody for purposes of Miranda during the interrogation, prior to the detective’s advisement of rights.
The Fifth Amendment of the United States Constitution provides that “[n]o person ... shall be compelled in any criminal case to be a witness against himself.” U.S. Const. amend. V. In Dickerson v. U.S., the Supreme Court affirmed that Miranda is indeed a “constitutional decision,” and thus, the enforcement of Miranda’s procedural safeguards, which protect the constitutional guarantee, is not merely an exercise of the Supreme Court’s “supervisory authority to regulate evidence.” 530 U.S. 428, 429-32, 120 S.Ct. 2326, 2329, 147 L.Ed.2d 405 (2000). The Fifth Amendment is made applicable to the states by incorporation under the Fourteenth Amendment. U.S. Const. amend. XIV; Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493-94, 12 L.Ed.2d 653 (1964). In Maryland, a confession may be admitted against an accused only when it has been “determined that the confession was ‘(1) voluntary under Maryland non-constitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights,[7] and (3) elicited in conformance with the mandates of Miranda.’” Ball v. State, 347 Md. 156, 173-74, 699 A.2d 1170, 1178 (1997) (quoting Hof v. State, 337 Md. 581, 597-98, 655 A.2d 370, 378 (1995)).
*210 The Miranda Court reacted to police interrogation tactics within the “inherently compelling pressures” of custodial police interrogation, which can “undermine the individual’s will to resist and ... compel him to speak where he would not otherwise do so freely.” Id. at 467, 86 S.Ct. at 1624. The Court recognized that the inherently coercive atmosphere of custodial interrogation “blurs the line between voluntary and involuntary statements!!.]” Dickerson, 530 U.S. at 435, 120 S.Ct. at 2331. To counteract this risk of compulsion, the Court “adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination.” J.D.B. v. North Carolina, 564 U.S. 261, 269, 131 S.Ct. 2394, 2401, 180 L.Ed.2d 310 (2011). Prior to questioning, a suspect “must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.” Miranda, 384 U.S. at 444, 86 S.Ct. at 1612; see also Vines v. State, 285 Md. 369, 374, 402 A.2d 900, 903 (1979) (noting that statements obtained from a defendant not advised of Miranda warnings must be excluded from evidence if the statements flow from a custodial interrogation within the meaning of Miranda).
A. The definition of custody for purposes of Miranda
A determination of whether an individual is in Miranda custody is an objective inquiry based on the totality of the circumstances. Stansbury v. California, 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994); Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977); Beckwith v. United States, 425 U.S. 341, 346-47, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976). In deciding whether an individual is in custody for purposes of Miranda, we must determine, in light of “the objective circumstances of the interrogation,” Stansbury, 511 U.S. at 323, 114 S.Ct. at 1529, whether a “reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.” Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995). Thus, we determine an individual’s *211 freedom of movement objectively in light of the totality of circumstances of the situation, taken as a whole. See Yarborough v. Alvarado, 541 U.S. 652, 667, 124 S.Ct. 2140, 2151, 158 L.Ed.2d 938 (2004); Stansbury, 511 U.S. at 322-23, 114 S.Ct. at 1529; accord Owens v. State, 399 Md. 388, 428, 924 A.2d 1072, 1095 (2007); see also Ransome v. State, 373 Md. 99, 104, 816 A.2d 901, 904 (2003) (stating that a court conducting a “totality of the circumstances” test must not “parse out each individual circumstance for separate consideration ]”). Facts often relevant to our analysis include:
when and where [the interrogation] occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning whether he came completely on his own, in response to a police request or escorted by police officers. Finally, what happened after the interrogation whether the defendant left freely, was detained or arrested may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.
Thomas v. State, 429 Md. 246, 260-61, 55 A.3d 680, 689 (2012) (citations omitted).
Not all restraints on freedom, however, constitute custody for Miranda purposes. Berkemer v. McCarty, 468 U.S. 420, 437, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317 (1984) (declining to grant the freedom of movement test “talismanic power”). Thus, “[o]nce the scene is set and the players’ lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.” Thompson, 516 U.S. 99, 112, 116 S.Ct. at 465, 133 L.Ed.2d 383 (emphasis added) (citations, quotation marks, and brackets omitted). Thus, “the safeguards *212 prescribed by Miranda become applicable as soon as a suspect’s freedom of action is curtailed to a ‘degree associated with formal arrest.’” Berkemer, 468 U.S. at 440, 104 S.Ct. at 3150. Furthermore, the lodestar of our objective test is whether Brown was subjected to an environment containing the inherently compelling pressures of custodial- interrogation, which powered the Court’s decision in Miranda. See id. at 437, 104 S.Ct. at 3148-49 (stating that “[fjidelity to the doctrine announced in [Miranda] requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated.”).
B. The case at bar
Brown argues that the factual findings rendered by the suppression court fully support the ruling that Brown was in custody for Miranda purposes during the interrogation at issue. We agree. A reasonable person in Brown’s position would not have felt free to terminate the interrogation and leave. Furthermore, we determine that Brown’s freedom was restrained to the degree associated with a formal arrest.
The following facts support this conclusion: Brown was taken to the hospital to treat multiple gunshot wounds; Detective Howard came to the hospital and advised Brown that his purpose in coming to the hospital was to “obtain” Brown; Detective Howard arrived at the hospital to collect Brown at approximately 5:40 a.m.; Detective Howard transported Brown directly from the hospital in hospital garb with his head still bandaged; Brown was transported in the rear seat of a marked police cruiser; Brown was told that his car was towed to the police station because of dried blood on the passenger side; Detective Howard escorted Brown through the north tower door of the police department, which is located apart from the entrance for the general public; Brown was placed in an isolated interrogation room upon his arrival, where he was subsequently interrogated; and Brown was arrested at the conclusion of the interrogation.
*213 The parties dispute how this Court should review the suppression court’s finding that Detective Howard “ask[ed] [Brown] if he would consent to coming back to ‘get[]’ a statement[ ]” and, in response, Brown “acquiesced[.]” Brown argues that the suppression court’s choice of words reflects that Brown felt compelled to acquiesce in the face of a coercive show of authority. The State counters that the words “consent” and “acquiesce[ ]” are largely synonymous, and thus, Brown was not compelled to accompany the detective to the police station.
“[W]e view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion,” here, Brown. Lee, 418 Md. at 148, 12 A.3d at 1245-46 (2011) (emphasis added) (citation and internal quotation marks omitted). The suppression court’s factual finding of “acquiesce[nce]” is substantially different than voluntary agreement, within the totality of the circumstances: the time, place, and manner of the acquiescence. Brown’s acquiescence took place early in the morning, at the hospital where Brown was being treated for gunshot wounds, after a visibly armed detective arrived to “obtain” Brown for questioning. Viewed in the light most favorable to Brown, his acquiescence, under the totality of the circumstances, necessarily indicates a lack of voluntariness, or at the very least, an atmosphere of compelling pressure. See Miranda, 384 U.S. at 467, 86 S.Ct. at 1624 (providing that the express purpose of Miranda’s safeguards is to combat the “inherently compelling pressures” of custodial interrogation, “which work to undermine the individual’s will to resist and to compel him to speak where he would not otherwise do so freely.”).
Brown was wearing disposable hospital scrubs when he was escorted from the hospital facility to the police department and subjected to interrogation. This factor tilts the interrogation toward the custodial end of the spectrum. See Bond v. State, 142 Md.App. 219, 233, 788 A.2d 705, 713 (2002) (finding custody for purposes of Miranda where Bond was interrogated in his bedroom, specifically noting the relevance of the fact that the interrogation took place while Bond was “partially *214 clothed[,]” in a “state of undress[ ]”). We determine that a reasonable person in Brown’s position—an individual in hospital garb, suffering from multiple gunshot wounds, without his or her vehicle—would feel inhibited from simply leaving the presence of the police. Furthermore, these circumstances, taken as a whole, demonstrate that Brown’s freedom of movement was curtailed to the degree associated with a formal arrest.
Brown was escorted through the north tower door of the Cambridge Police Department. The suppression court noted that this entrance is “apart from the entrance for the general public.”[8] Thereafter, Brown was seated in an interrogation room. The suppression court noted that “[t]he interview room is situated such that there is no view outside of the police headquarters and it is not easy to traverse from that location to the outside without guidance and in some instances the use of electronic access devices.”[9] Notably, the Miranda *215 Court was specifically concerned about providing procedural safeguards for those who are held incommunicado and cut off from the outside world. See Miranda, 384 U.S. at 457-58, 86 S.Ct. at 1619. Of course, simply because a person is interviewed by officers within a police station does not, in and of itself, signify that an individual is in custody for purposes of Miranda. Mathiason, 429 U.S. 492, 495, 97 S.Ct. at 714, 50 L.Ed.2d 714. It is, nonetheless, yet another factor in support of the ultimate conclusion that Brown was in custody for purposes of Miranda during the six minutes of interrogation that occurred prior to Miranda warnings in the interrogation/interview room on the second floor of the Cambridge Police Department. See Miranda, 384 U.S. at 461, 86 S.Ct. at 1621 (holding that “[a]s a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.”).
The Supreme Court’s analysis in Howes v. Fields is instructive and provides contrast to the case at bar regarding the change in circumstances Brown experienced when he was transported to the police station for questioning. In that case, Fields, a state prisoner, was escorted from his prison cell by a corrections officer to a conference room where he was questioned by two policemen about allegations that, before he came to prison, Fields had engaged in sexual conduct with a 12-year-old boy. Fields, 565 U.S. at 502, 132 S.Ct. at 1185. Fields was never given Miranda warnings. He was questioned between five and seven hours; was told multiple times he was free to leave; the police were armed; Fields was not restrained; the conference room door was sometimes open and sometimes shut; Fields stated multiple times that he no longer wanted to talk to the police but he never asked to go back to his cell; Fields confessed and the interview ended. Id. at 503, 132 S.Ct. at 1186. The Court ultimately found that this interrogation was not custodial. Id. at 517, 132 S.Ct. at 1194.
The Court emphasized that Fields was already imprisoned when he was taken for questioning. Given the relatively min *216 ute change in his physical environment, Fields’ situation did not present the same inherently compelling pressures contemplated by the Miranda Court:
A person who is “cut off from his normal life and companions,” [Maryland v. Shatzer, 559 U.S. 98, 106, 130 S.Ct. 1213, 1220, 175 L.Ed.2d 1045 (2010) ], and abruptly transported from the street into a “police-dominated atmosphere,” Miranda, 384 U.S. at 456, 86 S.Ct. 1602, may feel coerced into answering questions.... For a person serving a term of incarceration, we reasoned in Shatzer, the ordinary restrictions of prison life, while no doubt unpleasant, are expected and familiar and thus do not involve the same “inherently compelling pressures” that are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station. Id. [at 103, 130 S.Ct.] at 1219.
Fields, 565 U.S. at 511, 132 S.Ct. at 1190-91.
Contrastingly, in the case at bar, Brown was not taken from familiar surroundings in the outside world, nor was he already incarcerated at the time of questioning. More surprising than being taken from familiar surroundings, Brown was transported by police in the early morning hours from a hospital where he had been treated for multiple gunshot wounds, after his vehicle had been seized by police as evidence of a crime. Worse than being “cut off from normal life and companions,” police transported Brown directly from the hospital, while Brown still wore hospital scrubs, to a police-dominated setting—the interrogation room of a police station. Shatzer, 559 U.S. 98, 106, 130 S.Ct. 1213, 1220, 175 L.Ed.2d 1045. This drastic change in circumstances signifies the “inherently coercive pressures” contemplated by the Miranda Court. Fields, 565 U.S. at 509, 132 S.Ct. at 1190.
Furthermore, Thomas v. State, 429 Md. 246, 55 A.3d 680 (2012), presents a factual scenario that is distinguishable from the case at bar. In Thomas, this Court looked to the Court of Special Appeals’ analysis regarding Thomas’ initial confronta *217 tion with police, his transportation to the police station, and his ability to leave the station:
Here, a police officer called [Thomas] and asked if he could “come down to the [police] station,” telling him that it had to do with one of his children. [Thomas] agreed and drove himself to the police station. Although the police initiated the contact, the record reflects that the police requested [Thomas]’s presence rather than demanded it, and [Thomas] drove himself to the police station. These facts do not suggest police coercion or restraint. Indeed, by driving himself, [Thomas] had the ability to drive himself home if he had decided to end the interview and leave. The circumstances preceding the interview weigh against a finding of custody.
Id. at 262, 55 A.3d at 690 (quoting State v. Thomas, 202 Md.App. 545, 570, 33 A.3d 494, 509 (2011)) (internal quotation marks omitted). This Court ultimately affirmed the Court of Special Appeals’ determination that Thomas was not in custody for purposes of Miranda at the time he made the statements at issue. 429 Md. at 273, 55 A.3d at 697.
Thomas is distinguishable from the case at bar for several reasons. First, although both interrogations took place in the stationhouse setting, Thomas’ interrogation occurred after police called Thomas and invited him to come to the police station. Id. at 262, 55 A.3d at 690 (citing Thomas, 202 Md.App. at 570, 33 A.3d at 509). Contrastingly, Brown’s interrogation occurred after a detective approached Brown in the early morning hours at the hospital where Brown was treated for multiple gunshot wounds. Rather than receiving an invitation by phone, the detective told Brown that the detective’s purpose in coming to the hospital was to “obtain” Brown. Second, we emphasized that Thomas had travelled to the police station “of his own volition[.]” Id. at 272, 55 A.3d at 696. Conversely, Brown “acquiesced” to being transported from the hospital to the police station by Detective Howard. As we noted, viewed in the light most favorable to Brown, Brown’s acquiescence signifies resistance, and an atmosphere of compulsion. Third, Thomas drove himself to the interrogation. Id. at 262, 55 A.3d *218 at 690 (citing Thomas, 202 Md.App. at 570, 33 A.3d at 509). Brown was transported by police in the backseat of a police cruiser directly to the police station, while still dressed in hospital garb with his head bandaged. Lastly, in Thomas, we looked to the Court of Special Appeals’ determination that Thomas was able to drive himself home, if he decided to terminate the interview and leave. Id. (citing Thomas, 202 Md.App. at 570, 33 A.3d at 509). Brown was not able to drive himself home from the police station because his car had been seized as evidence of a crime.
The suppression court’s finding that Brown was “advised ... numerous times that he was not under arrest[ ]” does not alter our ultimate conclusion. We note that the suppression court also found that Brown was not informed, at the outset of the interrogation or at any time thereafter, that he was free to leave or free to terminate the interrogation. In Buck v. State, 181 Md.App. 585, 956 A.2d 884 (2008), the Court of Special Appeals analyzed circumstances in which an individual was told by police multiple times that he was “free to leave[.]” Id. at 626, 956 A.2d at 908. In one instance, before Buck agreed to accompany the officers to the police station, one of the detectives “told Buck that he would not be under arrest and would be free to leave at any time. [The detective] testified: ‘All he had to do was say the word and I would bring him home.’ ” Id. at 598, 956 A.2d at 892. The Court of Special Appeals reasoned that “when a suspect has been told by the police, clearly and unequivocally, that he is not under arrest and can leave at any time, but the contemporaneous conduct of the police has the effect of nullifying that advice, the advice ‘will not carry the day.’ ” Id. at 626, 956 A.2d at 908 (emphasis added) (quoting Wayne LaFave, Criminal Procedure § 66(d), at 737 n. 57 (3d ed. 2007)). The Court of Special Appeals ultimately found “[a] reasonable person in Buck’s situation would not think, however, based on the conduct of the officers, that he had the freedom to break off contact with the police.” Id. at 626, 956 A.2d at 908. Similarly, in the case at bar, based on the conduct of the officers, a reasonable person in Brown’s position would not have felt free to break off contact with the *219 police. Further, Brown, unlike Buck, was never told that he was free to leave, or given the option to break off contact with the police. Given the varying degrees of police interaction with citizens, we determine a statement that one is “not under arrest[ ]” is inherently more compelling than a statement that one is “free to leave.”
Lastly, the fact that Brown was told by police that he was a “victim” does not change our ultimate conclusion. Similar to our analysis regarding the fact that Brown was told that he was “not under arrest,” the contemporaneous conduct of the police had the effect of nullifying the notion that Brown was considered as only a victim. See id. at 626, 956 A.2d at 908. Brown was “obtain[ed]” from a hospital where he was being treated for multiple gunshot wounds, his car was confiscated by police as evidence of a crime, and he was transported by police directly from the hospital to the police station in the early morning hours while he was still wearing hospital garb with his head bandaged. Upon arrival at the police station, he was held in an isolated interview room where he was eventually interrogated. A reasonable person in Brown’s position would not feel as though he or she was being considered as only a victim within the investigation.
For these reasons, we conclude that Brown was in custody for Miranda purposes when he made the statements at issue on appeal. Under the totality of the circumstances, a reasonable person in Brown’s position would not have felt at liberty to break off the questioning and leave. Furthermore, there was a restraint on Brown’s freedom of movement to the degree associated with a formal arrest. The circumstances in the case at bar presented the same concerns as those that powered the Miranda decision. Thus, we hold that the trial court properly granted Brown’s motion to suppress his statements.
JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR DORCHESTER COUN *220 TY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY DORCHESTER COUNTY.
Barbera, C.J. and McDonald, J., dissent.

. See Md. Code Ann., Cts. & Jud. Proc. § 12-302(c) (2013 Repl. Vol., 2016 Supp.) (providing for the State’s right of appeal from the suppression of evidence, under certain circumstances).

. The first-level factual findings of the suppression court and the court’s conclusions regarding the credibility of testimony must be accepted by this Court unless clearly erroneous. Thomas v. State, 429 Md. 246, 259, 55 A.3d 680, 688 (2012). As further outlined herein, after consideration of the briefs, record, and oral arguments in this matter, on April 4, 2016, this Court ordered that this matter be remanded, without affir-mance or reversal, to the suppression court for the sole purpose of the entry of findings of fact on the issue of custody.

. Unless otherwise noted as (1) testimony presented at the suppression hearing or (2) quotations from Detective Flynn's interview of Brown, all quoted factual information is derived from the suppression court’s findings of fact.

. The State does not dispute that the statements at issue before us— those that Brown made to Detective Flynn during the six minutes before the detective advised him of his Miranda rights—were the product of interrogation. See Argueta v. State, 136 Md.App. 273, 284, 764 A.2d 863, 869 (2001) (holding that the test to be applied in determining whether express questioning constitutes an interrogation for Miranda purposes is whether the police officer should know that the questioning is reasonably likely to elicit an incriminating response). At issue before us is whether Brown was in custody for purposes of Miranda during the six minutes of interrogation preceding the advisement of rights.

. The record contains a video recording of the interrogation that reflects the passage of time. We can discern from the video that *205 Detective Flynn issued Miranda warnings approximately six minutes into the interrogation.

. As noted, Detective Flynn read Brown the Miranda warnings between six and seven minutes into the interrogation. Brown then indicated a desire for counsel. The interrogation did not cease and the court suppressed the statements Brown made during this latter part of the interrogation. The State has not challenged that aspect of the suppression court's ruling.

. Article 22 of the Declaration of Rights provides “[t]hat no man ought to be compelled to give evidence against himself in a criminal case.”

. The State argues that this finding is clearly erroneous, as there is no evidence to support the suppression court’s finding that the north tower door is apart from the entrance for the general public. Detective Howard, however, testified at the suppression hearing that, upon his arrival with Brown at the Cambridge Police Department, he “responded to the north tower door which in the front parldng lot is the main stairwell leading to the second floor of the Police Department where Detective Curran and Detective Flynn were waiting outside.” We determine that it is not clearly erroneous for the suppression court to determine that the north tower door is not an entrance used by the general public.

. The State contends that the suppression court’s finding regarding the layout of the police station was clearly erroneous because there was no evidence to support it. Maryland Rule 5-201(b) allows judges to take judicial notice of facts that are “not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.” We determine that the layout of a police station in a jurisdiction which seats one circuit court judge falls within the scope of Rule 5-201. See Abrishamian v. Washington Med. Group, 216 Md.App. 386, 413-14, 86 A.3d 681, 696-97 (2014) (noting that courts may take judicial notice of categories of "adjudicative facts” "capable of certain verification” that "run the gamut” including facts that are known in the geographic area where the case is pending).