Darwin Naum Monroy Madrid v. State of Maryland, No. 50, September Term, 2020

**KNOWING AND VOLUNTARY WAIVER OF RIGHTS UNDER MIRANDA v. ARIZONA – VOLUNTARINESS OF CONFESSION – COMMON LAW OF MARYLAND – DUE PROCESS CLAUSE OF FOURTEENTH AMENDMENT TO CONSTITUTION OF UNITED STATES – ARTICLE 22 OF MARYLAND DECLARATION OF RIGHTS – DEFENSE OF DURESS –** Court of Appeals held that defendant knowingly and voluntarily waived his rights under Miranda v. Arizona, 384 U.S. 436 (1966) and that defendant's confession was voluntary under common law of Maryland, Due Process Clause of Fourteenth Amendment to Constitution of United States, and Article 22 of Maryland Declaration of Rights. Court concluded that circumstance that defendant was sixteen years old, immigrant to United States, and not given Miranda advisement in writing did not render Miranda advisement given verbally by detective in defendant's first language, Spanish, insufficient and did not render defendant's waiver of rights involuntary. Detective's statement to defendant, prior to advisement of Miranda rights, that he knew defendant was in United States illegally, and later, statements to defendant that he was in danger from gangs did not render defendant's waiver of rights involuntary.

As to common law of Maryland, Court held that State met its burden to prove by preponderance of evidence that defendant's confession was not product of promise of special consideration from a prosecuting authority or other form of assistance. As to Due Process Clause and Article 22, Court determined that State has met its burden to prove by preponderance of evidence that defendant's confession was voluntary under totality of circumstances and was not result of police conduct that overbore his will and induced him to confess.

Court of Appeals also held that trial court was correct in determining that giving jury instruction on duress was unwarranted as there was no evidence of present, imminent, and impending threat. Court concluded defendant intentionally or recklessly placed himself in situation in which it was reasonably foreseeable that he would be subjected to coercion and was therefore as matter of law not entitled to defense of duress.

IN THE COURT OF APPEALS

OF MARYLAND

No. 50

September Term, 2020

_____

DARWIN NAUM MONROY MADRID

v.

STATE OF MARYLAND

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Opinion by Watts, J.

_____

Filed: July 9, 2021



 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.

Suzanne C. Johnson, Clerk

In this case, we are asked to determine whether a defendant's confession was obtained in compliance with Miranda v. Arizona, 384 U.S. 436 (1966) and voluntary under the common law of Maryland, the Due Process Clause, and Article 22 of the Maryland Declaration of Rights. We are also asked to determine whether the trial court correctly declined to instruct the jury on the defense of duress.

In the Circuit Court for Prince George's County, the State, Respondent, charged Darwin Naum Monroy Madrid, Petitioner, with multiple offenses, including the murder of Gamaliel Nerio-Rico and the attempted murder of Carlos Tenorio-Aguirre. Prior to trial, during custodial interrogation in connection with the investigation of the offenses, Madrid made a statement advising a law enforcement officer that he shot Nerio-Rico, the deceased, and shot at Tenerio-Aguirre, the person who survived the shooting, *i.e.*, Madrid confessed. At trial, the State offered evidence that Madrid was a member of the gang Mara Salvatrucha, better known as MS-13, and that a higher-up in the gang ordered him to kill Tenorio-Aguirre, the surviving victim, who was a member of a rival gang known as 18th Street, and evidence of Madrid's statement.

Madrid gave the statement while being interviewed by Detective Luis Cruz of the Homicide Unit of the Prince George's County Police Department and was sixteen years old at the time. During the interview, before administering the Miranda rights, among other things, Detective Cruz told Madrid that, although he was not in the country legally, he still had legal rights. Detective Cruz advised Madrid of his Miranda rights and asked whether he understood his rights, and Madrid responded affirmatively. During the interview, Detective Cruz mentioned to Madrid that he was in danger from his own gang, MS-13, and

the rival 18th Street gang. Madrid ultimately confessed. Before trial, Madrid moved to suppress the statement. The circuit court denied the motion to suppress, determining that Miranda had been complied with and that Madrid's confession was voluntary.

At trial, as a witness on his own behalf, Madrid testified that that he had been involved with MS-13 and performed various tasks on behalf of the gang. On the night of the murder and attempted murder, Madrid went to a nightclub that members of MS-13 frequented. While at the nightclub, Madrid telephoned a higher-up in MS-13, who was said to be located outside of the country in El Salvador, and advised that members of the 18th Street gang were in the nightclub. Madrid testified that the higher-up called him back and gave him an order. Madrid and the other member of MS-13 ran to an apartment building in which Tenorio-Aguirre lived and were provided with guns. The record indicates, and Madrid admits, that he fatally shot Nerio-Rico and repeatedly shot at Tenorio-Aguirre, who survived the shooting, outside of the apartment building.

At trial, Madrid testified that he participated in the murder and attempted murder because, if he had not complied, he would have been punished "the following day" or "as soon as [the punishment] could possibly be done." Madrid's counsel submitted to the circuit court written proposed jury instructions, including an instruction on duress. After the circuit court and the parties discussed the propriety of giving a jury instruction on duress, the circuit court declined to give the instruction.

The jury found Madrid guilty. Madrid appealed, and the Court of Special Appeals affirmed his convictions. See Madrid v. State, 247 Md. App. 693, 741, 239 A.3d 770, 798 (2020). The Court of Special Appeals held that the circuit court did not err in denying the

motion to suppress or declining to give a jury instruction on duress. See id. at 713, 728, 239 A.3d at 781, 790. Madrid filed a petition for a writ of *certiorari*, which this Court granted. See Madrid v. State, 472 Md. 312, 245 A.3d 991 (2021).

Before us, Madrid contends that he did not knowingly and voluntarily waive his rights under Miranda because, among other things, he was not given the advisement of rights in writing, no attempt was made to assess whether he understood the advisement, and Detective Cruz informed him before the advisement that he knew Madrid was in the country illegally. In addition, Madrid contends that his confession was not voluntary under the common law of Maryland because during the interrogation, Detective Cruz made references to threats on his life by gangs and, according to Madrid, the only conceivable interpretation is that the references were intended to imply an offer of protection if he confessed. Madrid argues that his confession was not voluntary under Article 22 and the Due Process Clause because of, among other circumstances, his age, inexperience with law enforcement officers, and the alleged coercion of the confession by Detective Cruz mentioning that he was in danger from gangs. Finally, Madrid insists that there was sufficient evidence to generate an instruction on the defense of duress.

The State responds that Madrid freely and voluntarily waived his rights under Miranda, that his confession was voluntary in all respects, and that the evidence at trial was not sufficient to generate a jury instruction on duress.

Below, in Part I, we hold that Madrid knowingly and voluntarily waived his rights under Miranda. In addition, we hold that Madrid's confession was voluntary under the common law of Maryland, the Due Process Clause, and Article 22. We conclude that the

circumstances that Madrid was sixteen years old, an immigrant to the United States, and not given the <u>Miranda</u> advisement in writing did not render the advisement given verbally by Detective Cruz in Madrid's first language, Spanish, insufficient and did not render Madrid's waiver of rights involuntary. In addition, we determine that Detective Cruz's statement to Madrid, prior to advisement of his <u>Miranda</u> rights, that he knew Madrid was in the country illegally and statements made later that Madrid was in danger from gangs did not render Madrid's waiver of rights involuntary.

As to the common law of Maryland, we conclude that the State has met its burden to prove by a preponderance of the evidence that Madrid's confession was not the product of a promise or implication of special consideration from a prosecuting authority or other form of assistance. As to the Due Process Clause and Article 22, the State has met its burden to prove by a preponderance of the evidence that Madrid's confession was voluntary under the totality of the circumstances and not the result of police conduct that overbore his will and induced him to confess.

In Part II, we hold that the circuit court was correct in determining that a jury instruction on duress was unwarranted as there was no evidence of a present, imminent, and impending threat. Moreover, the defense of duress was unavailable as a matter of law because any potential threat to Madrid arose because he intentionally or recklessly placed himself in a situation in which it was reasonably foreseeable that he would be subject to coercion.

## BACKGROUND

## Motion to Suppress

At the hearing on the motion to suppress, without objection, the circuit court admitted into evidence a videotaped recording and a transcript of Madrid's interview with Detective Cruz. Although Detective Cruz and Madrid spoke Spanish during the interview, the transcript includes an English translation.

A review of the transcript reveals the following. Detective Cruz began the interview at 11:52 p.m. on April 18, 2016, by asking Madrid: "Are you awake man? What's your full name man?" (Italics omitted). Madrid indicated that he was born on August 21, 1999, that he was from Guatemala, and that he had been in the United States for nearly two years. Although Madrid said that he had been expelled from school, he did not indicate how far he had gotten in school. Madrid indicated that he worked, that he was paid $1,400 every other week, and that he gave half of his pay to his mother.

After asking questions that did not pertain to the murder and attempted murder, which Madrid answered, Detective Cruz advised Madrid of his <u>Miranda</u> rights by stating:

> Well, ah, the most I know right now, I know you're not legal, legally here in the country of America, right? Even though that's the situation, you still have rights under the law here in, in the United States. O.K.? Just U/I[1] I'm gonna advi[s]e you of your rights ah, then we're gonna get into why you're here right now, understand? O.K. I'm Officer Cruz you told me U/I ah, I work with the Prince George's County Police. O.K. You have the right to remain silent, if you decide to waive this right, anything you say can be presented as evidence a.., against you in court. Ah, you have the right to talk to an attorney before being interrogated, and you also have the right to have an attorney present w.., while you are being interrogated O.K.? If you want an attorney but you don't have the economic means to pay, to pay for one,

---

[1]The first page of the transcript indicates that "U/I" stands for "Unintelligible[.]"

- 5 -

an attorney will be provided without cost O.K.?  Ah, if you want to answer questions now without the presence of an attorney, you have the right to stop answering these questions at any time, O.K.?  Do you understand, do you understand the rights?  Yes?  Yes?  O.K.  [NOISE]  How long have you been working with the company?

(Ellipses and last brackets in original) (paragraph breaks omitted).  On brief in this Court, Madrid acknowledges that, although the transcript does not indicate so, he said: "Sí"—which means "yes" in English—after Detective Cruz asked: "Do you understand, do you understand the rights?  Yes?  Yes?"  Likewise, at the hearing on the motion to suppress, Madrid's counsel stated: "I think [Madrid] does say yes, although the transcriber wasn't so sure and does not attribute yes to [Madrid] in the description."

After advising Madrid of his <u>Miranda</u> rights and asking more questions, Detective Cruz said: "Um-hum, U/I say something kid, [NOISE] I can play this game with you all night if you want, but I'm not in that kind of, of, of, I don't wanna waste time, understand?" (Brackets in original).  During the interview, Detective Cruz referred to the surviving victim (Tenorio-Aguirre) and the gang to which he belonged (18th Street), stating: "[D]o you understand that the guy who was shot, not the, not the one who was shot in his head, the one who survived, Carlos, that he went to Eighteen (18) understand?"

Later, the following exchange occurred, during which Detective Cruz referred to the gang that sent Madrid and the 18th Street gang:

> [DETECTIVE CRUZ]: [A]re you ready to spend your whole life in jail?  Because you know that there, there's where you're gonna go today.  I'm not here to judge you, O.K.?  My job as a detective is to clarify what happened, because I see a young guy, hard worker who maybe made a mistake.  I'm telling you something right now, your life's in danger, not from us, but from the very gang that sent you to do this, yes or no, you don't believe it?

- 6 -

[MADRID]: I don't know.

[DETECTIVE CRUZ]: I'm telling you, you are, I'm telling you, you are, I'm telling you right now, this very moment, the Eighteen (18) already has the word out there. As an investigator I knew that information.

After that, Detective Cruz stated: "Now I'm not here to judge you and say hey, you're a bad person because you did this and this, and this, understand? We're human and we make mistakes. But honestly are you ready to lose your life in a jail?" (Paragraph break omitted).

Later, during the following exchange, Madrid confessed:

[DETECTIVE CRUZ]: I'm telling you that you're in this now understand? Now if you decide, it's your life, I'm not here to beat you up or, or to, to be disrespectful to you, because you're human, you're a y.., a young man, understand? But I'm saying, are you ready to spend your life like that, understand? Right now you run a risk, because you all left a lotta information out there. So, the one who's in El Salvador, or the one who gave the word, are at risk too, understand? Stuar[t], you know him right? He's, he's at risk right now, what do you think the gang's gonna do when they find out you all already fell?

[MADRID]: I don't know.

[DETECTIVE CRUZ]: They're gonna kill you, because that's what they do right? Easy to send the word and sent you all to do that to, to those guys, right? Easy right? What does a call cost, what does a call cost? Nothing. Unfortunately you have family that really loves you, your sister is out there crying right now. Because for her you're everything, she told me when her mom left, left Guatemala, you stayed with her taking care of her, right? And today what, where's the person she looked at and was everything in her life? Really a father to her, your mom who struggled to bring you here, what happened with all that? You don't think you came here to do something stupid like that, right? Your, your objective wasn't that. You[r] mom even though she says this last year you lost it somewhat, she says you're a hard worker, but that you spend too much time on the street. I know it's, it's easy to get lost in this country, this country's damned, understand? But that doesn't mean or indicate you're a bad person, understand? Now [NOISE] I don't know what got into your head the night this happened. That's something you can tell me, were you threatened or what? Or did you want to do this, what was it?

- 7 -

[MADRID]: I did it.

[DETECTIVE CRUZ]: Sorry?

[MADRID]: Just that I did it.

(Ellipsis and sixth brackets in original) (paragraph breaks omitted). Detective Cruz and Madrid then began discussing the circumstances leading up to and surrounding the murder and attempted murder.

At the hearing on the motion to suppress, as a witness for the State, Detective Cruz testified that, when he was growing up, Spanish was the language that he used to communicate with his family. Detective Cruz indicated that the interview took place in an interview room and that although the interview began with Madrid's head on the table, Madrid was "was awake and responsive." Detective Cruz described Madrid's demeanor as "[a] bit apprehensive, but cooperative." Detective Cruz testified that he did not suspect that Madrid was under the influence of drugs or alcohol. Detective Cruz testified that, during the interview, he read aloud verbatim (in Spanish) from a card on which the Miranda rights are printed in Spanish. Detective Cruz testified: "When I read the card to him, this is from viewing the video, after every line that I read to him I said okay, looked at him for reassurance and he shook his head like a nod like yes." During the interview, Detective Cruz was unarmed and wearing plainclothes.

As a witness on his own behalf, Madrid testified that, before his arrest in this case, he had not had any interactions with law enforcement officers other than one with immigration officers near the border. Madrid testified that, when he was in high school in

the United States, he took classes in science, algebra, history, and English as a second language. According to Madrid, when he entered the interview room, he "was sort of disoriented because it was so cold." Madrid explained that "[t]he room was very cold" and that he was wearing only a shirt, pants, and sandals. Madrid testified that he slept between the time that he was brought to the room and the time that Detective Cruz came in and that he did not remember whether he had woken up by the time Detective Cruz entered the room. Madrid testified that he did not remember Detective Cruz telling him about his rights.

After hearing testimony, the circuit court heard arguments by the parties. Madrid's counsel acknowledged "that the Miranda rights were read in sufficient form to [Madrid] in Spanish in language that he understands." Nonetheless, Madrid's counsel contended that, instead of orally advising Madrid of his rights in Spanish, Detective Cruz should have allowed Madrid to read the written form. Madrid's counsel stated that Detective Cruz verbally advised Madrid of his rights in thirty-six seconds. When addressing the voluntariness of the confession, Madrid's counsel did not mention either Detective Cruz's statement about Madrid being in the country illegally but still having rights or his statements about Madrid being in danger from gangs.

After the circuit court heard argument by the prosecutor, the following exchange occurred, during which the circuit court denied the motion to suppress:

> [MADRID'S COUNSEL]: Very brief, Your Honor. We're talking about 36 seconds. And I don't know if the average law student can understand being read their rights in 36 seconds. But, we're talking here about a juvenile who is cold, confused, disoriented. This waiver was not knowing[].

THE COURT: He didn't seem disoriented on the video. Did you see anything in his demeanor on the video?

[MADRID'S COUNSEL]: Well, Your Honor, it was his testimony that he felt disoriented.

THE COURT: I know. But, you can't tell it in his demeanor, so therefore it's very hard for me. And I'm just asking did you see anything.

[MADRID'S COUNSEL]: No, I did not.

THE COURT: I'm not saying it wasn't cold in there because they might have had the air on and he only had a shirt. A lot of people don't like air. I believe he was cold.

[MADRID'S COUNSEL]: All right. So, we do know that it was late at night. He was sleeping when he had the opportunity. And I don't think a 16 year-old at that time can understand enough, and I don't think he did.

THE COURT: It is not a blanket for any juvenile. It has to be case by case as to what occurred with this particular juvenile and the next juvenile, et cetera.

[MADRID'S COUNSEL]: Right. And this juvenile came from another country, where he hasn't heard about Miranda before or he hasn't had any interaction with the police before.

THE COURT: That's a fact that sometimes you don't believe when someone gets on the stand and says they're not familiar because they've watched lot of TV, et cetera. And I understand that, but that doesn't negate whether or not, in fact, Miranda was provided in the manner it was supposed to be provided. That's what I have to look at as well, right?

[MADRID'S COUNSEL]: Right. And that part I agree. But, he didn't understand, that's my whole point.

THE COURT: He said he did. He said yes. No one else said yes but him. I mean I watched him in the video. I have to say that his mannerism in the video is very similar to his mannerism as he testifies on the stand. He's very soft spoken. He doesn't speak up. And I think that he exhibited -- it so much mirrors his behavior. That's just his personality, period. I don't think he's a big -- you know, just sitting, but he conveys. I mean I accepted his answers under oath today. Why would I not accept it in the Miranda giv[ing] of the

- 10 -

rights?  I'm not sure why not.  It is the same to me.  He acted the same.

To be honest with you, I thought Detective Cruz was a 16 year-old [sic].  I thought he was very calm and very methodical about how he went about asking the questions and what he did with your client.  I thought he, you know -- because I've seen some videos.  I have to be honest with you.  I thought some detectives were off the hook in terms of their mannerisms.  I did not see that.  I think that you take that into account when you have a 16 year-old in front of you as well.

But, you keep going I mean if you still see some violation of the Miranda.  I don't think he has a choice, card or form.  Yes, it may be in Spanish, but even if you have one in Spanish, if a person doesn't have higher grade of reading level, they might not understand reading in Spanish.  I mean you just never know.  But, if you do it verbally, then you have that face-to-face.

[MADRID'S COUNSEL]: Right.  And I do agree that the detective had a choice about what mechanism to use.

THE COURT: Right.

[MADRID'S COUNSEL]: But, they have to choose one that actually conveys the meaning to the person that has to hear it.  That's not what happened here.

THE COURT: Not from the video.  He answered.  He said yes, and then he kept talking.  He provided the Miranda in the way it calls for under the law with respect[ t]o the voluntariness, and that one statement, we are not going to play all night, that just to me is just statement that, look, we are not going to be here all night.  You either talk or you don't talk.  It's really up to you.  Is that the statement where you say it is not --

[MADRID'S COUNSEL]: Yes.  I agree with Your Honor up to point --

THE COURT: I don't get another statement.  I didn't hear anything in terms of him saying you are going to have to talk tonight.[2]  I didn't hear that on the video.  I'm sorry.

---

[2]Madrid testified that, before he was transferred to the room in which Detective Cruz would interview him, Detective Cruz told him: "[I]t is better for you if you talk."  On cross-examination, Detective Cruz denied making such a statement to Madrid.  Before us, Madrid does not make any arguments regarding the alleged statement.

[MADRID'S COUNSEL]: That's page seven.[3]  Page seven is the one I was talking about.

THE COURT: All right.  So, I deny your motion with respect to the suppression of the statement both on the grounds of Miranda violation and voluntariness.

## Trial Testimony

At trial, as a witness for the State, Manuel Alexander Beltran-Cazun, who was eighteen at the time of trial, testified pursuant to a plea agreement with the State.  Beltran-Cazun testified that he was a member of MS-13 and had been for approximately a year and a half, that he knew Madrid, and that he had been with Madrid on the night of the offenses.  Beltran-Cazun indicated that MS-13 is divided into cliques and that each MS-13 member has a rank.  According to Beltran-Cazun, "esquina" is the lowest rank, and "homeboy" is the highest rank.  Beltran-Cazun testified that the homeboys control the cliques.

When Beltran-Cazun joined MS-13, he was an esquina.  When Beltran-Cazun met Madrid, he (Madrid) was a member of MS-13 and was an esquina.  Initially, Beltran-Cazun and Madrid belonged to different cliques.  At some point, Madrid was asked to join the clique to which Beltran-Cazun belonged, which was based in Langley Park.  According to Beltran-Cazun, in April 2016, the homeboy of the clique was a man from El Salvador known as "Delincuente."

Beltran-Cazun had a friend who lived in Newbury Square Apartments, which he called "the 410 apartments."  Tenorio-Aguirre also lived in Newbury Square Apartments.

---

[3]Page seven of the transcript of the interview includes a statement by Detective Cruz to the effect of "I can play this game with you all night if you want[.]"

- 12 -

Tenorio-Aguirre was a member of 18th Street, a rival gang to MS-13. Beltran-Cazun knew that Tenorio-Aguirre was a member of 18th Street because Tenorio-Aguirre told him so and because there were photographs on Facebook of Tenorio-Aguirre showing 18th Street gang signs. Members of MS-13 refer to members of 18th Street as "chavalos" or "chavalas."[4] When asked what members of MS-13 were supposed to do with members of 18th Street, Beltran-Cazun responded: "Kill them before they kill us."

On April 16, 2016, at approximately 11 p.m., Beltran-Cazun, his girlfriend, and a friend of hers went to the Galaxy Nightclub. There, Beltran-Cazun saw Madrid. While Beltran-Cazun was at the nightclub, a member of MS-13 known as "Hellboy" told Beltran-Cazun that members of 18th Street were in the nightclub and stated that: "We have to go and get the chavalo in 410." Beltran-Cazun understood that Hellboy was telling him to kill Tenorio-Aguirre.

Beltran-Cazun and Hellboy walked from the nightclub to a dumpster near the Newbury Square Apartments, where they met Madrid and a person known as "Stuart." According to Beltran-Cazun, a bag was on the ground near the dumpster and Madrid told him: "Here's your gun in the bag." Beltran-Cazun retrieved a gun from the bag. Madrid and Stuart also had guns, but Hellboy did not. Madrid and Stuart were waiting for someone known as "El Carta" to send them a text message indicating that Tenorio-Aguirre had left the nightclub. After the text message was received, Beltran-Cazun and Madrid went to the

---

[4]"Chavalo" and "chavala" are colloquial Spanish terms for "kid[.]" *Chavala*, WordReference.com, https://www.wordreference.com/es/en/translation.asp?spen=chavala.

front of the apartment building. As Tenorio-Aguirre began walking down the sidewalk, Beltran-Cazun looked at Madrid, who "raised his head, like to say, yeah."

Beltran-Cazun shot Tenorio-Aguirre once. Beltran-Cazun tried to shoot Tenorio-Aguirre a second time, but his gun "locked." While Beltran-Cazun was looking at his gun, he heard a second shot. Madrid ran toward Beltran-Cazun, who told him (Madrid) that his gun was locked. Madrid then ran after Tenorio-Aguirre. Beltran-Cazun and Hellboy ran toward 23rd Street. While he and Hellboy were running, Beltran-Cazun heard more shots. When Beltran-Cazun and Hellboy got close to 23rd Street, they saw Madrid and Stuart running toward them. The four of them met near some apartment buildings where Beltran-Cazun, Madrid, and Stuart put their guns back in the bag. Beltran-Cazun went home.

On April 17, 2016, at approximately 12 p.m., Beltran-Cazun and Madrid met and spoke to Delincuente on the phone. Delincuente asked: "Did you guys carry out the mission[?]" Madrid advised that he had shot Nerio-Rico—*i.e.*, the person who died.

As a witness for the State, Detective Cruz testified that, on April 17, 2016, he began investigating a murder and an attempted murder that had taken place that day near the Newbury Square Apartments, approximately one mile away from Galaxy Nightclub. During Detective Cruz's testimony, the circuit court admitted into evidence the videotaped recording of his interview of Madrid. Parts of the recording were played for the jury, and Detective Cruz interpreted what he and Madrid said. Detective Cruz testified that Madrid admitted that he shot the person who died—Nerio-Rico—in the head once and that he fired the rest of his bullets at Tenorio-Aguirre.

As a witness for the State, Sergeant George Norris of the Gang Intelligence Unit of

the Prince George's County Police Department was accepted by the circuit court as an expert in gangs generally and MS-13 specifically. According to Sergeant Norris, "an unofficial motto" of MS-13 is "kill, rape and control." Based on his review of information related to the case, Sergeant Norris opined that Madrid was a member of MS-13. Sergeant Norris opined that Tenorio-Aguirre was a member of 18th Street and that it would be very dangerous for a member of 18th Street to go to the Galaxy Nightclub, which members of MS-13 frequent.

Sergeant Norris explained that MS-13 members are divided into the following ranks, in ascending order: esquina, paro, observacion, paisa, chequeo, homeboy, second word, first word, palabrero, and corredor. Sergeant Norris explained that, although an esquina is not "a graduate of [] the gang program[,]" an esquina is still a member of MS-13. Usually, palabreros and corredores are in El Salvador, Honduras, or Guatemala. Sergeant Norris opined that Hellboy was a homeboy and that the person named Delincuente was either a palabrero or a corredor.

On cross-examination, Sergeant Norris testified that MS-13 members can be punished for not doing what they are told. For example, a "13" is a punishment in which an MS-13 member is beaten for thirteen seconds. According to Sergeant Norris, an MS-13 member could also be killed as punishment. Sergeant Norris explained that gangs use the term "green light" to refer to "a death warrant" or "a hit on somebody[,]" whether on a member of the gang, a member of a rival gang, or someone else. Sergeant Norris opined that Madrid would have been punished if he had not done "the mission," but explained that the possible punishments varied, and which one Madrid would have received depended on

- 15 -

his history with MS-13, whether he was liked, and whether he had an excuse for not doing the assignment. Referring to MS-13, Sergeant Norris testified: "You don't leave the gang. . . . When you join, it's for life."

On redirect-examination, Sergeant Norris provided additional testimony about getting out of a gang during the following exchange:

[PROSECUTOR:] Have you ever had individuals approach you about getting out of gang because they don't want to do a mission?

[SERGEANT NORRIS:] Yes.

[PROSECUTOR:] Describe what that is like. What is it like when somebody approaches you about not wanting to do mission?

[SERGEANT NORRIS:] I mean for me, it's a nightmare because it's almost an impossible task to get people out of MS-13 unless they completely cooperate with you, which is, you would have to basically relocate them to new location somewhere far away. They would have to start a new life. They would have to have federal involvement.

[PROSECUTOR:] Have you assisted with that though?

[SERGEANT NORRIS:] Yes.

[PROSECUTOR:] And has that occurred prior to that person actually doing the mission?

[SERGEANT NORRIS:] Yes.

As a witness on his own behalf, Madrid acknowledged that he had been involved with MS-13 and that he had been an esquina but testified that, to be a member of MS-13 or belong to the gang, a person must hold a higher-up rank, such as homeboy. Madrid testified that he first got involved with MS-13 in late 2015, when one day a group of people tried to rob him in a bathroom at his high school and members of MS-13 helped him. From

then on, whenever members of MS-13 asked Madrid for help, he complied. For example, Madrid complied with requests by members of MS-13 to give them money for lunch or cigarettes once or twice a week. Madrid also complied with orders to walk around areas where members of MS-13 hung around and report it if he saw members of other gangs. In addition, Madrid complied with orders to "pick up rent"—*i.e.*, collect money that certain individuals paid members of MS-13.

Madrid testified that he was once punished for giving excuses and not answering phone calls. Madrid testified that the punishment consisted of being beaten by three people for thirteen seconds. Madrid testified that he had to obey orders from Delincuente, or else Delincuente would call homeboys and chequeos and tell them to punish him. According to Madrid, he once told the homeboys that he "wanted to calm things down[,]" but he was told that he "couldn't because they were the ones who gave the orders."

On April 16, 2016, Madrid went to Galaxy Nightclub and met up with his friends Beltran-Cazun and Hellboy. While Madrid was at the nightclub, Delincuente telephoned him to determine whether any members of 18th Street were in the nightclub. Madrid called Delincuente back and said that members of 18th Street were in the nightclub. Madrid was told to wait a few minutes. Madrid went outside the nightclub and waited. While Madrid was waiting, Stuart came out of the nightclub and joined him. Afterward, Delincuente telephoned Madrid and gave him an order.[5]

Madrid and Stuart ran to the Newberry Square apartments. At the time, neither

---

[5]The circuit court precluded Madrid from testifying about the content of the order but allowed him to testify about what he did as a result of receiving it.

Madrid nor Stuart had a gun. Shortly after Madrid and Stuart reached the area of the apartments, a car drove up. Stuart went to the car and got a backpack, which contained three guns. Next, Beltran-Cazun and Hellboy arrived. Later, members of 18th Street drove up, parked, and got out of their car. In Madrid's words: "We made the attack. We tried to carry out the order we were given." Madrid testified that he remembered admitting to Detective Cruz that he participated in the murder and attempted murder. Madrid testified that he did not know whom he shot.

Madrid's counsel asked him: "[W]hen somebody in MS-13 commits a gang infraction, how quickly do they get punished?" Madrid responded: "That I know of, as soon as possible. The following day. As soon as it could possibly be done." Madrid's counsel asked him why he participated in the murder of Nerio-Rico and the attempted murder of Tenorio-Aguirre. Madrid responded: "Because it was a major order coming from someone that gives the word. And it was given that there was a green light. And if I didn't carry out, that green light would have been for me." Madrid's counsel asked why he had not given an excuse when he received the order. Madrid responded:

> Because since I was already at the club with the rest of them, I just couldn't really give them an excuse. Perhaps if I would have been like at my house or somewhere else, or I wasn't close by, I would have been able to give them an excuse, but being there with them, I just don't know what excuse I could have given them.

**Discussion of Jury Instruction on Duress and Verdicts**

Madrid's counsel submitted to the circuit court proposed jury instructions, including one on duress. Before closing arguments, during a bench conference, the circuit court asked Madrid's counsel whether the jury instruction on duress should be given in light of

this Court's holding in <u>McMillan v. State</u>, 428 Md. 333, 51 A.3d 623 (2012).[6]  Madrid's

counsel responded that the evidence showed that there was "no getting out of the gang"

and that Madrid was "terrified" and "did this because he knew what would happen if he

didn't."  Madrid's counsel contended that <u>McMillan</u> and other relevant cases did not state

that "the harm that's anticipated by the person experiencing duress has to occur that day."

The prosecutor contended that <u>Williams v. State</u>, 101 Md. App. 408, 646 A.2d 1101

(1994), <u>cert. denied</u>, 337 Md. 90, 651 A.2d 855 (1995), stands for the proposition that a

duress defense is unavailable where the defendant has joined a criminal organization and

placed himself in a position of being subjected to coercion.  Madrid's counsel noted that

the position that participating in a gang precludes a defense of duress had not been

incorporated into the Maryland Criminal Pattern Jury Instructions.  Madrid's counsel

indicated that the duress instruction was warranted because higher-ranking members of

MS-13, such as Delincuente, had been telephoning Madrid, and Madrid had testified "that

the punishment could come within a day."

The next day, after hearing additional argument from the parties, the circuit court

declined to give a jury instruction on duress, stating:

> All right.  It's been long argument on duress.  And I mean, I've
> thought about this long and hard.  I said I reread all that you provided me last
> night.  I read it yesterday.  And in terms of the defense of duress, I do not
> find that that issue has been raised, and I will not give that as an instruction
> to the jury, not under the facts of this case where it is that he voluntarily

---

[6]In <u>McMillan</u>, 428 Md. at 348, 51 A.3d at 632, in discussing the applicability of the
duress instruction, this Court stated that, "[i]n order to constitute a defense, the duress by
another person on the defendant must be present, imminent, and impending, and of such a
nature as to induce well grounded apprehension of death or serious bodily injury if the act
is not done."  (Citation omitted).

joined MS-13, knowing it was a violent gang.

And now, according to the Williams case, you cannot use that because you know that there are penalties for your actions when you joined. You've already experienced penalties. And the fact that you are now about to perhaps experience a greater penalty does not, to me, then allow you to use the defense of duress. You chose to take that path. You have to live with that path. So I will not allow it. It's not under the law.

The jury found Madrid guilty of first-degree murder of Nerio-Rico, attempted first-degree murder of Tenorio-Aguirre, and two counts each of first-degree assault, use of a handgun in the commission of a felony or crime of violence, conspiracy to commit first-degree murder, and participation in a criminal gang.[7]

## Opinion of the Court of Special Appeals

On October 1, 2020, the Court of Special Appeals affirmed Madrid's convictions. See Madrid, 247 Md. App. at 741, 239 A.3d at 798. Addressing the Miranda issue, the Court of Special Appeals concluded that the recording of the interview established that Detective Cruz properly advised Madrid of his rights and that Madrid's waiver was knowingly and voluntarily given. See id. at 716, 239 A.3d at 784. Addressing the voluntariness of the confession, the Court of Special Appeals determined that Madrid's confession was voluntary and not the result of conduct by Detective Cruz that overbore his

---

[7]Madrid was sentenced to life imprisonment for first-degree murder; a consecutive sentence of life imprisonment, with all but twenty years suspended, for attempted first-degree murder; concurrent sentences of twenty years' imprisonment, with all but five years suspended, for the two counts of use of a handgun in the commission of a felony or crime of violence; a consecutive sentence of twenty years' imprisonment, with all but five years suspended, for one count of participation in a criminal gang; a concurrent sentence of ten years' imprisonment for the second count of participation in a criminal gang; and a concurrent sentence of thirty years' imprisonment for one count of conspiracy to commit first-degree murder.

will and induced him to confess. See id. at 726, 239 A.3d at 789. The Court of Special Appeals observed that, when testifying at the suppression hearing, Madrid made no mention of Detective Cruz's statements about him being in the country illegally or being in danger from gangs. See id. at 712-13, 239 A.3d at 781. The Court of Special Appeals concluded that, assuming Madrid did not forfeit appellate review of the arguments concerning the statements, neither of the statements constituted an improper inducement. See id. at 712-13, 239 A.3d at 781. The Court of Special Appeals explained that the "statements were simply descriptive of the serious position in which Madrid had placed himself." Id. at 722, 239 A.3d at 787.

The Court of Special Appeals held that the circuit court did not err in declining to give a jury instruction on duress. See id. at 728, 239 A.3d at 790. The Court of Special Appeals determined that Madrid was not facing a present, imminent, and impending threat at the time of the murder and attempted murder, as shown by his testimony that MS-13 might punish him the following day for not carrying out the order to shoot Tenorio-Aguirre. See id. at 732-33, 239 A.3d at 793. In addition, the Court of Special Appeals determined that Madrid was not entitled to an instruction on duress because "foreseeable coercion [] was . . . a known attribute of affiliation with the MS-13 gang[.]" Id. at 734, 239 A.3d at 794.

**Petition for a Writ of *Certiorari***

On November 20, 2020, Madrid petitioned for a writ of *certiorari*, raising the following three issues:

1. Did the Court of Special Appeals err in holding that the defense of duress

was "unavailable . . . as a matter of law" to Madrid because of his gang involvement?

2. Did the Court of Special Appeals err in holding that Madrid failed to meet the threshold of "some evidence" required to generate the defense of duress?

3. Did the Court of Special Appeals err in upholding the denial of Madrid's motion to suppress his statement to the police?

    a. Did the interrogating officer's statements—"your life's in danger . . . from the very gang that sent you to do this," "what do you think the gang's gonna do when they find out you all already fell," "right now you run a risk," "[t]hey're gonna kill you," and that the victim's gang also "already has the word out there"—after which Madrid immediately confessed, constitute an impermissible inducement?

    b. Did the State fail to meet its burden of establishing that 16-year-old Madrid, who had no prior experience with the criminal justice system, knowingly and voluntarily waived his *Miranda* rights following a 40-second advisement of his rights which did not include a written waiver?

    c. Under the totality of the circumstances was Madrid's confession involuntary?

(Alteration and ellipses in original).  On February 8, 2021, this Court granted the petition.

See Madrid, 472 Md. 312, 245 A.3d 991.

## DISCUSSION

### I. Miranda and Voluntariness of the Confession

### The Parties' Contentions

Madrid contends that the State failed to establish that his statement was obtained in conformance with the requirements of Miranda, 384 U.S. 436, and voluntary under Maryland common law, the Due Process Clause, and Article 22 of the Maryland Declaration of Rights.  Madrid argues that when reviewing a statement given by a juvenile, "special care" or "heightened scrutiny" must be used in evaluating the record to assure that

the juvenile's statements are voluntary under the totality of the circumstances. Madrid maintains that his Miranda waiver was not made knowingly and voluntarily given that he was sixteen at the time, was not presented with his rights in written form, little care was given to "assessing [his] capacity to understand his rights," and, according to Madrid, Detective Cruz made no attempt to explain the significance of the Miranda warnings.

Madrid asserts that Detective Cruz "undermined" the advisement before reading the Miranda rights by stating that he (Detective Cruz) knew that Madrid was not in the country legally. Madrid contends that, among other things, Detective Cruz stated: "[Y]our life's in danger, not from us, but from the very gang that sent you to do this," "the Eighteen (18) already has the word out there[,]" "are you ready to lose your life in a jail[,]" and "you decide, it's your life," and that these statements created fear, causing him to confess. Madrid maintains that after reading the rights, Detective Cruz informed him that he could "play this game with you all night[,]" implying that Detective Cruz was willing to question him all night until he confessed.

Madrid argues that the only conceivable way to interpret Detective Cruz's reference to threats on his life is as an implied offer of protection if he confessed. Madrid asserts that he relied on Detective Cruz's implied offer of protection, and that he confessed after Detective Cruz's inducements, making his confession involuntary under the common law of Maryland. Madrid maintains that under the totality of the circumstances his confession was not voluntary under the Due Process Clause and Article 22. Among other things, Madrid indicates that he was interrogated late at night in a cold room while sleep deprived. Madrid maintains that Detective Cruz pressured him by stating that his mother and

- 23 -

stepfather had been brought in for questioning and making the statements discussed above.

The State responds that Madrid waived his contentions in connection with Detective Cruz's statements about his immigration status and any danger that the gangs may have posed by failing to raise the arguments in the circuit court. Insofar as the voluntariness of the confession is concerned, the State contends that Madrid's contention that his confession was involuntary under the common law of Maryland is waived because the contention is based solely on Detective Cruz's statements about the MS-13 and 18th Street gangs posed a danger, which, according to the State, is an argument that Madrid's counsel did not raise at the suppression hearing. The State argues that Madrid's contention that his confession was involuntary under the Due Process Clause and Article 22 is also waived because Madrid's counsel did not make such an argument at the suppression hearing, and, instead, relied only on the alleged involuntariness of the confession under the common law of Maryland.

With respect to the merits, the State asserts that Madrid freely and voluntarily waived his <u>Miranda</u> rights. The State points out that Madrid was sixteen, had been in the United States for nearly two years, had completed some high school, did not appear to be under the influence of drugs or alcohol, and responded affirmatively to Detective Cruz's question about understanding his <u>Miranda</u> rights. The State maintains that the statement Detective Cruz made about Madrid's immigration status prior to the advisement of his <u>Miranda</u> rights was intended to let Madrid know that he had such rights even though he is not a citizen of the United States.

The State contends that Madrid's confession was voluntary under the common law

of Maryland as Detective Cruz did not offer Madrid anything, such as protection or arrangements for preferential treatment by a prosecutor or a court. The State argues that Madrid's confession was voluntary under the Due Process Clause and Article 22 because, among other things, he was advised of his rights in Spanish (his first language) in easy-to-understand words, was interviewed by only one detective, and was not subjected to a prolonged, intense, or highly confrontational interrogation.[8]

**Standard of Review**

In Thomas v. State, 429 Md. 246, 259, 55 A.3d 680, 688 (2012), this Court set forth the standard of review of a trial court's ruling on a motion to suppress as follows:

> Our review of a grant or denial of a motion to suppress is limited to the record of the suppression hearing. The first-level factual findings of the suppression court and the court's conclusions regarding the credibility of testimony must be accepted by this Court unless clearly erroneous. The evidence is to be viewed in the light most favorable to the prevailing party. We undertake our own independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case.

(Cleaned up). An appellate court reviews without deference a trial court's ultimate determination as to whether a confession was voluntary and reviews for clear error the trial court's underlying findings of fact. See Gorge v. State, 386 Md. 600, 610-11, 873 A.2d 1171, 1177 (2005). Similarly, an appellate court reviews without deference a trial court's

---

[8]In a reply brief, Madrid contends that the State's arguments as to preservation are not properly before the Court because the State failed to raise the arguments before the Court of Special Appeals or in a cross-petition for a writ of *certiorari*. In addition, Madrid asserts that his contention that his confession was involuntary under the Due Process Clause and Article 22 is not waived because, at the hearing on the motion to suppress, his counsel noted that the same factors apply to both the question of whether he had voluntarily waived his Miranda rights and the question of the voluntariness of his confession.

ultimate determination as to whether <u>Miranda</u> was violated and reviews for clear error the trial court's underlying findings of fact. <u>See</u> <u>Owens v. State</u>, 399 Md. 388, 403, 924 A.2d 1072, 1080 (2007).

## Knowing and Voluntary Waiver of Rights Under <u>Miranda</u>

It is well known that in <u>Miranda</u>, 384 U.S. at 478-79, the Supreme Court held that a law enforcement officer must advise a defendant of certain rights before conducting a custodial interrogation, stating:

> [W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, . . . [h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

A trial court may not admit a confession made during a custodial interrogation unless a law enforcement officer properly advised the defendant of the defendant's rights under <u>Miranda</u> and the defendant knowingly, intelligently, and voluntarily waived those rights. <u>See</u> <u>Gonzalez v. State</u>, 429 Md. 632, 637, 57 A.3d 484, 486-87 (2012). The State has the burden to prove by a preponderance of the evidence a knowing, intelligent, and voluntary waiver of the defendant's rights under <u>Miranda</u>. <u>See</u> <u>id.</u> at 650, 57 A.3d at 494.

In <u>Gonzalez</u>, <u>id.</u> at 648, 652, 57 A.3d at 493, 495, in examining the <u>Miranda</u> waiver of an eighteen-year-old who was a recent immigrant to the United States, this Court stated:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the

circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

(Cleaned up). When assessing the totality of the circumstances as to <u>Miranda</u>, a court must consider the defendant's age, experience, education, background, intelligence, and conduct. See <u>id.</u> at 652, 57 A.3d at 495. This Court observed that the defendant's waiver was not rendered unknowing by the circumstance that the defendant was eighteen years old, uneducated, and a recent immigrant to the United States unfamiliar with the criminal justice system in this country. See <u>id.</u> at 657, 57 A.3d at 499. This Court explained that these circumstances, without more, did not render the defendant unable, as a matter of law, to make a knowing and voluntary waiver of his <u>Miranda</u> rights. See <u>id.</u> at 657, 57 A.3d at 499.

In <u>Miller v. State</u>, 251 Md. 362, 381, 247 A.2d 530, 540 (1968), <u>vacated in part on other grounds</u>, 408 U.S. 934 (1972),[9] this Court held that a trial court did not err or abuse its discretion in determining that the defendant knowingly and intelligently waived his constitutional rights. The defendant was sixteen when he was arrested and interviewed in connection with a murder. See <u>Miller</u>, 251 Md. at 365, 247 A.2d at 532. A law enforcement officer testified about advising the defendant of his <u>Miranda</u> rights as follows:

> I [] stated the following: You have the absolute right to remain silent. The constitution requires that I so inform you of this right and you need not talk to me if you do not wish to do so. You do not have to answer any of my questions. Should you talk to me anything you might say in answer to my questions can and will be used and introduced into evidence in court against

---

[9]In <u>Miller</u>, 408 U.S. 934, the Supreme Court vacated this Court's judgment "insofar as it le[ft] undisturbed the death penalty imposed" and remanded to this Court for further proceedings.

you. If you want an attorney to be present at this time or any time hereafter you are entitled to such counsel. If you cannot afford to pay an attorney one will be appointed for you if you so desire. Any statement you do make here must be made willingly, freely and voluntarily, without any threats or promises of reward being made to you. In view of these facts do you wish to give a statement and answer my questions. [The defendant]'s answer was, 'Yes sir.'

Id. at 366, 247 A.2d at 532 (internal quotation marks omitted).

The defendant was initially interviewed for ninety-five minutes, during which he denied being involved in the crime. See id. at 366, 247 A.2d at 532. Afterward, the defendant was given a meal, and the investigating officers left the police station with the intent to search the defendant's home. See id. at 366, 247 A.2d at 532. On the way to the defendant's home, the investigating officers were asked via radio to return to the police station, which they did, and were told by another officer that the defendant said that he wanted to tell the truth. See id. at 366-67, 247 A.2d at 532. The defendant was given the same Miranda advisement as earlier and once again responded: "Yes sir." Id. at 367-68, 247 A.2d at 533 (internal quotation marks omitted). During a second interview, the defendant confessed. See id. at 373-74, 247 A.2d at 536. The defendant did not ask to speak with his parents until after an officer asked him to sign a typed statement of the questions and answers from the interview. See id. at 376-77, 247 A.2d at 537-38.

This Court concluded that the defendant validly waived his constitutional rights in light of him "agreeing to give a statement coupled with the attendant circumstances, that is the proper constitutional warnings at the beginning of each questioning period, no allegations of any police misconduct, and [the defendant]'s own request for the interview when he gave his inculpatory statement[.]" Id. at 379, 247 A.2d at 539. This Court

explained that, although "admissions of juveniles require special caution[,]" "the age of a [defendant], in itself, does not render a confession involuntary." Id. at 378-79, 247 A.2d at 539 (citations omitted).

In Fare v. Michael C., 442 U.S. 707, 728 (1979), the Supreme Court held that a juvenile court correctly determined that a juvenile knowingly and voluntarily waived his Miranda rights. The juvenile was sixteen-and-a-half when he was arrested and interviewed in connection with a murder. See id. at 709-10. At the time, the juvenile had been on probation in the juvenile court since age twelve. See id. at 710. During the interview, one of the officers advised the juvenile of his rights. See id. The following exchange then occurred, during which the juvenile agreed to speak with the officers:

[OFFICER:] Do you understand all of these rights as I have explained them to you?

[JUVENILE:] Yeah.

[OFFICER:] Okay, do you wish to give up your right to remain silent and talk to us about this murder?

[JUVENILE:] What murder? I don't know about no murder.

[OFFICER:] I'll explain to you which one it is if you want to talk to us about it.

[JUVENILE:] Yeah, I might talk to you.

[OFFICER:] Do you want to give up your right to have an attorney present here while we talk about it?

[JUVENILE:] Can I have my probation officer here?

[OFFICER:] Well I can't get a hold of your probation officer right now. You have the right to an attorney.

[JUVENILE:] How I know you guys won't pull no police officer in and tell me he's an attorney?

[OFFICER:] Huh?

[JUVENILE:] How I know you guys won't pull no police officer in and tell me he's an attorney?

[OFFICER:] Your probation officer is Mr. Christiansen.

[JUVENILE:] Yeah.

[OFFICER:] Well I'm not going to call Mr. Christiansen tonight. There's a good chance we can talk to him later, but I'm not going to call him right now. If you want to talk to us without an attorney present, you can. If you don't want to, you don't have to. But if you want to say something, you can, and if you don't want to say something you don't have to. That's your right. You understand that right?

[JUVENILE:] Yeah.

[OFFICER:] Okay, will you talk to us without an attorney present?

[JUVENILE:] Yeah I want to talk to you.

Id. at 710-11 (cleaned up). In response to questions by the officers, the juvenile made statements and drew sketches that incriminated him in the murder. See id. at 711.

The Supreme Court agreed with the juvenile court that the juvenile validly waived his Miranda rights, stating:

The transcript of the interrogation reveals that the police officers conducting the interrogation took care to ensure that [the juvenile] understood his rights. They fully explained to [the juvenile] that he was being questioned in connection with a murder. They then informed him of all the rights delineated in *Miranda*, and ascertained that [the juvenile] understood those rights. There is no indication in the record that [the juvenile] failed to understand what the officers told him. Moreover, after his request to see his probation officer had been denied, and after the police officer once more had explained his rights to him, [the juvenile] clearly expressed his willingness to waive his rights and continue the interrogation.

Further, no special factors indicate that [the juvenile] was unable to understand the nature of his actions. He was a 16 ½-year-old juvenile with considerable experience with the police. He had a record of several arrests. He had served time in a youth camp, and he had been on probation for several years. He was under the full-time supervision of probation authorities. There is no indication that he was of insufficient intelligence to understand the rights he was waiving, or what the consequences of that waiver would be. He was not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit.

Id. at 726-27.

In McIntyre v. State, 309 Md. 607, 626, 526 A.2d 30, 39 (1987), this Court affirmed a trial court's determination that a defendant voluntarily waived his Miranda rights. The defendant was fifteen when he was arrested while on his way to school and interviewed in connection with an alleged rape. See id. at 609, 526 A.2d at 31. As officers transported the defendant to a police station, they informed him that he had been arrested for rape, told him the alleged victim's name, and advised him of his right to remain silent, his right to speak with counsel and have counsel present during any interview, and his right to be appointed counsel if he could not afford one. See id. at 609, 526 A.2d at 31. The defendant said that he understood his rights and asked when he could see his mother. See id. at 609, 526 A.2d at 31. One of the officers responded that the defendant could not see his mother at the time because he had been charged as an adult. See id. at 609, 526 A.2d at 31. At the police station, the defendant was again Mirandized, again said that he understood his rights, and signed a Miranda waiver form after making a second request to see his mother, which was denied. See id. at 609-10, 526 A.2d at 31. The defendant provided a statement regarding the alleged rape. See id. at 609-10, 526 A.2d at 31. In the statement, although the defendant denied committing the rape, he made several admissions that the State used

at trial as proof of guilt.  See id. at 611, 526 A.2d at 32.

We determined that the officers took care to ensure that the juvenile understood his rights; there was no indication that the juvenile failed to understand his rights or the nature of his actions; and the juvenile was not worn down by improper interrogation tactics, a long interview, trickery, or deceit.  See id. at 624-25, 526 A.2d at 38.  We stated that, where a defendant was a juvenile, we must also consider "whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."  Id. at 615-16, 526 A.2d at 34 (cleaned up).  We stated that the circumstance "[t]hat no evidence was adduced by the State concerning [the defendant]'s prior experience with the justice system [did] not alone compel a holding that the requisite evidence did not in its totality satisfy the preponderance standard."  Id. at 625, 526 A.2d at 39.  We explained that, although the defendant asked to see his mother, in the absence of testimony by the defendant at the suppression hearing, this Court could not conclude that his request constituted an invocation of the right to remain silent.  See id. at 625, 526 A.2d at 39.

In In re Darryl P., 211 Md. App. 112, 172, 63 A.3d 1142, 1177 (2013), another case involving a juvenile, the Court of Special Appeals held that Miranda was not violated.  The juvenile was seventeen when he was charged with being involved in attempted murder.  See id. at 121, 63 A.3d at 1147.  The following exchange occurred, during which a detective Mirandized the juvenile:

> [DETECTIVE]: I'm gonna read your *Miranda* rights.  Pay attention.  O.K.
> You have the right to remain silent.  Do you understand that?

- 32 -

[JUVENILE]: Umhm.

[DETECTIVE]: Is that yes?

[JUVENILE]: Yes.

* * *

[DETECTIVE]: Alright. Anything you say can and will be used against you in a court of law. Do you understand that?

[JUVENILE]: Yes.

[DETECTIVE]: You have the right to talk to a lawyer, and have him present with you while you are being questioned. Do you understand that?

[JUVENILE]: Yes.

[DETECTIVE]: If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. Do you understand that?

[JUVENILE]: Yes.

[DETECTIVE]: You can decide at any time to exercise these rights, and not answer any questions or make any statements. Do you understand that?

[JUVENILE]: Yes.

* * *

[DETECTIVE]: Alright. Ah, do you understand each of these rights I have explained to you?

[JUVENILE]: Yes.

Id. at 164-65, 63 A.3d at 1172-73 (ellipses in original) (emphasis omitted). Although the juvenile did not expressly indicate that he would waive his rights and speak with the detective, the juvenile court determined that the juvenile's responses to the detective's questions constituted a course of conduct that indicated that he waived his rights to counsel

- 33 -

and to remain silent.  See id. at 165-66, 164, 63 A.3d at 1173.  The Court of Special Appeals

determined that the juvenile court's findings of fact were not clearly erroneous.  See id. at

172, 63 A.3d at 1177.

**Voluntariness of a Confession Generally**

A trial court may not admit a confession made during a custodial interrogation that

is involuntary under the common law of Maryland, the Due Process Clause, or Article 22.

See Brown v. State, 452 Md. 196, 209-10, 156 A.3d 839, 846-47 (2017).  Where a

defendant moves to suppress a confession on the ground that it was involuntary, the State

has the burden to prove by a preponderance of the evidence that the confession was

voluntary.  See Hill v. State, 418 Md. 62, 75, 12 A.3d 1193, 1200 (2011).

**Voluntariness of a Confession Under the Common Law of Maryland**

Under the common law of Maryland, a confession is involuntary where "it is the

product of an improper threat, promise, or inducement by the police."  Lee v. State, 418

Md. 136, 158, 12 A.3d 1238, 1252 (2011) (citation omitted).  The common law of

Maryland prohibits the admission of a confession where:

> (1) any officer or agent of the police promises or implies to the suspect that
> he will be given special consideration from a prosecuting authority or some
> other form of assistance in exchange for the suspect's confession, and (2) the
> suspect makes a confession in apparent reliance on the police officer's
> explicit or implicit inducement.

Id. at 161, 12 A.3d at 1253 (citing Hillard v. State, 286 Md. 145, 153, 406 A.2d 415, 420

(1979)).  "Both prongs of the *Hillard* test must be satisfied before a confession is deemed

to be involuntary."  Lee, 418 Md. at 161, 12 A.3d at 1253 (quoting Winder v. State, 362

Md. 275, 310, 765 A.2d 97, 116 (2001)) (brackets omitted).  The first prong of the Hillard

- 34 -

"test is an objective one[,]" in that "a suspect's subjective belief that he or she will be advantaged in some way by confessing will not render the confession involuntary unless the belief was premised upon a statement or action made by an interrogating officer." Winder, 362 Md. at 311, 765 A.2d at 116 (citations omitted). The second prong of the Hillard test requires a court "to determine whether there was a nexus between the promise or inducement and the accused's confession" by assessing "the particular facts and circumstances surrounding the confession[,]" including "the amount of time elapsed between the inducement and confession." Id. at 311-12, 765 A.2d at 117.

In Winder, id. at 306, 317-18, 765 A.2d at 114, 120, this Court held that, under the common law of Maryland, the defendant's confession was involuntary because it was the product of improper promises and threats by law enforcement officers. The defendant (whose hometown was Salisbury, Wicomico County) was suspected of murdering a grandfather, grandmother, and their adult granddaughter, who was the defendant's fiancé, in their home in Fruitland, Wicomico County. See id. at 315, 281, 283, 765 A.2d at 119, 100, 101. During an interview, officers told the defendant that friends of the victims (who were beloved in the town) were coming after him for revenge. See id. at 316, 765 A.2d at 119. The officers told the defendant that, if he identified the victims' bodies and showed remorse for murdering them, the officers could essentially protect him from any vigilantes. See id. at 316, 765 A.2d at 119. The officers implied that, if the defendant continued to deny murdering the victims, the officers could not guarantee the defendant's safety. See id. at 316, 765 A.2d at 119. One of the officers told the defendant:

I've got to save you, mentally, and I've got to save you physically. And this

- 35 -

family can help you physically. You see what I'm saying? You follow what I'm saying to you? Because I know that there are people in that family and not the immediate family who are ready to come out here and do some bad things to you. You follow me? And I can't be there all the time.

Id. at 317, 765 A.2d at 119.

In addition to offering the defendant protection from vigilantes, the officers tried to convince the defendant that their goal was not to make him confess so that he would be convicted, but instead to gather information about how and why he murdered the victims so that the officers could help him with obtaining psychological assistance and leniency from prosecutors. See id. at 314, 765 A.2d at 118. For instance, shortly after the interview began, one of the officers told the defendant, whose first name was Eugene, that they were

not interested in sending you to jail for the rest of your life, ... We think the person who committed these needs help. I think you need help. The only way we can get you that help is for you to let us know what happened. We can let the State's Attorney's Office know hey, Eugene's told us what happened, but I think Eugene needs some help. The only way we can do that is for you to explain to us why.

Id. at 314, 765 A.2d at 118 (ellipsis in original). Ultimately, the defendant confessed to murdering the victims. See id. at 284, 765 A.2d at 102.

This Court concluded that the confession was involuntary under the common law of Maryland because both prongs of the Hillard test were satisfied. See id. at 318, 320-21, 765 A.2d at 120, 121-22. This Court determined that the first prong of the Hillard test was satisfied because, during the twelve-hour interview, the officers repeatedly said that they would help the defendant and "offered him an apparent means to garner leniency from the state prosecutors and the trial court and protection from an angry mob." Id. at 317, 765 A.2d at 120. The second prong of the Hillard test was satisfied because the record showed

that the defendant "was intimidated by his surroundings and impressed by the matters communicated to him by the officers." Id. at 318-19, 765 A.2d at 120.

**Voluntariness of a Confession Under the Due Process Clause and Article 22**

The Due Process Clause of the Fourteenth Amendment states: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law[.]" The Self-Incrimination Clause of the Fifth Amendment states: "No person . . . shall be compelled in any criminal case to be a witness against himself[.]" The Self-Incrimination Clause is incorporated in the Due Process Clause and is applicable to the States. See Dickerson v. United States, 530 U.S. 428, 434 (2000). Under both the Due Process Clause and the Self-Incrimination Clause, a confession made during a custodial interrogation must be voluntary to be admissible. See id. at 432-33.

The counterpart of the Maryland Constitution to the Self-Incrimination Clause is Article 22 of the Maryland Declaration of Rights, which states: "That no man ought to be compelled to give evidence against himself in a criminal case." This Court has generally interpreted Article 22 *in pari materia* with the Self-Incrimination Clause. See State v. Rice, 447 Md. 594, 644, 136 A.3d 720, 749 (2016). As with the Due Process Clause and the Self-Incrimination Clause, under Article 22, a confession made during a custodial interrogation must be voluntary to be admissible. See Brown, 452 Md. at 209-10, 156 A.3d at 846-47.

The Supreme Court has set forth a test for voluntariness that precludes the admission of confessions that are "the result of police conduct that overbears the will of the suspect and induces the suspect to confess." Lee, 418 Md. at 159, 12 A.3d at 1252 (citing Arizona

v. Fulminante, 499 U.S. 279, 288 (1991); Colorado v. Connelly, 479 U.S. 157, 167 (1986);

Spano v. New York, 360 U.S. 315, 323 (1959)). To determine whether a confession is

voluntary under federal constitutional law, a court must consider the totality of the

circumstances. See Dickerson, 530 U.S. at 434. In Fulminante, 499 U.S. 279,

> the Supreme Court made it clear that constitutional voluntariness does not require that all promises, threats, or inducements render a confession involuntary; instead, the federal constitution requires only that courts consider promises, threats, or inducements as part of the totality of the circumstances that courts must look at to determine voluntariness.

Reynolds v. State, 327 Md. 494, 505, 610 A.2d 782, 787 (1992).

In Hof v. State, 337 Md. 581, 596-97, 655 A.2d 370, 377-78 (1995), this Court set

forth several examples of circumstances that this Court and the Court of Special Appeals

have considered when assessing the totality of the circumstances as to the voluntariness of

a confession, stating:

> The "totality of the circumstances" includes a number of factors, *e.g.* where the interrogation was conducted; its length; who was present; how it was conducted; its content; whether the defendant was given Miranda warnings; the mental and physical condition of the defendant; the age, background, experience, education, character, and intelligence of the defendant; when the defendant was taken before a court commissioner following arrest[;] and whether the defendant was physically mistreated, physically intimidated[,] or psychologically pressured.

(Citations omitted).

In Moore v. State, 422 Md. 516, 531-32, 30 A.3d 945, 954-55 (2011), this Court set

forth additional considerations for a court to take into account where the confession

involved a juvenile defendant, stating:

> [G]reat care must be taken to assure that statements made to the police by juveniles are voluntary before being permitted in evidence. The absence of

a parent or guardian at the juvenile's interrogation is an important factor in determining voluntariness, although the lack of access to parents prior to interrogation does not automatically make a juvenile's statement inadmissible.

(Cleaned up).

In Moore, id. at 532-33, 30 A.3d at 955, this Court held that, under the Due Process Clause, the defendant's confession was not voluntary. Material to this Court's analysis were the circumstances that the defendant was sixteen years old, that he made thirteen requests to be allowed to telephone his mother, and that he did not confess until after "he had been subjected to a deliberate and unnecessary delay in bringing him before a judicial officer." Id. at 531, 524, 527, 530, 30 A.3d at 954, 950, 952, 953.

**Analysis**

In this case, we decline the State's invitation to refuse to consider certain of Madrid's contentions on the ground of lack of preservation for appellate review. As Madrid points out, the State neither cross-petitioned for a writ of *certiorari* nor raised in the Court of Special Appeals the issues as to lack of preservation that the State raises before us. On its own initiative, the Court of Special Appeals observed that, at the suppression hearing, Madrid did not testify about Detective Cruz's statements concerning his immigration status and any danger he may have been in from the gangs. See Madrid, 247 Md. App. at 712, 239 A.3d at 781. Nonetheless, the Court of Special Appeals addressed the merits of Madrid's contentions. We will do the same.

Turning to the merits, we conclude that, under the totality of the circumstances, the State has proven by a preponderance of the evidence that Madrid knowingly and

voluntarily waived his <u>Miranda</u> rights.  In assessing whether there was a valid waiver in this case, we consider the specific factors concerning defendants who were juveniles at the time of an interview that this Court set forth in <u>McIntyre</u>, as well as the factors that are generally applicable to defendants who were adults at the time of an interview.  The totality of the circumstances standard remains the same regardless of whether the person being interviewed is a juvenile or an adult.  <u>See</u> <u>McIntyre</u>, 309 Md. at 615, 526 A.2d at 34.

Here, an evaluation of the totality of the circumstances reveals that Madrid understood his <u>Miranda</u> rights and knowingly and voluntarily waived them.  At the time of the interview, Madrid was sixteen years and approximately eight months old.  Madrid had been in the United States for two years and had completed some high school in the United States, including classes in science, algebra, history, and English as a second language.  Madrid worked, was paid $1,400 every other week, and gave half of his pay to his mother.  Madrid is from Guatemala and his first language is Spanish, and Detective Cruz, whose first language is also Spanish, conducted the interview in Spanish.  Specifically, Detective Cruz advised Madrid of his <u>Miranda</u> rights in Spanish by reading aloud verbatim from a card on which the <u>Miranda</u> rights were printed in Spanish.  After the advisement, Madrid responded affirmatively to Detective Cruz's question concerning whether he understood his rights and willingly responded to other questions before and after the advisement.  Apart from Madrid's present argument that Detective Cruz did not comply with the requirements for the <u>Miranda</u> advisement of a juvenile because he (Detective Cruz) failed to ascertain how far Madrid went in school or to assess whether he was capable of understanding his rights, there is no indication that Madrid failed to understand his rights or the consequences

of waiving them.

According to Detective Cruz, Madrid did not appear to be under the influence of drugs or alcohol and "was awake[,] responsive[,]" "[a] bit apprehensive, but cooperative." For his part, at the suppression hearing, Madrid testified that he could not remember being given his <u>Miranda</u> rights, not that he was given his rights but was unable to comprehend them. In describing the circumstances of the <u>Miranda</u> advisement, the circuit court stated: "I thought Detective Cruz . . . was very calm and very methodical about how he went about asking the questions and what he did with [Madrid]." The interview began at 11:52 p.m. and Madrid confessed approximately twenty minutes later, at approximately 12:12 p.m. Between the start of the interview and when Madrid confessed, he and Detective Cruz were the only individuals present. During the advisement and interview, Detective Cruz was unarmed and in plainclothes. Although Detective Cruz told Madrid that he had spoken to Madrid's mother and stepfather, the transcript of the interview demonstrates that Madrid did not ask to speak with either of them or to have either of them present for the advisement or interview. In sum, Madrid was a sixteen year old whose first language is Spanish and who by his own account had worked and attended high school in this country and who was accurately advised of his <u>Miranda</u> rights verbally in Spanish by a single detective who grew up speaking Spanish, and, when asked, Madrid responded that he understood his rights.

Detective Cruz advised Madrid of his <u>Miranda</u> rights as follows:

Well, ah, the most I know right now, I know you're not legal, legally here in the country of America, right? Even though that's the situation, you still have rights under the law here in, in the United States. O.K.? Just U/I I'm gonna advi[s]e you of your rights ah, then we're gonna get into why you're here right now, understand? O.K. I'm Officer Cruz you told me U/I ah, I

- 41 -

work with the Prince George's County Police. O.K. You have the right to remain silent, if you decide to waive this right, anything you say can be presented as evidence a.., against you in court. Ah, you have the right to talk to an attorney before being interrogated, and you also have the right to have an attorney present w.., while you are being interrogated O.K.? If you want an attorney but you don't have the economic means to pay, to pay for one, an attorney will be provided without cost O.K.? Ah, if you want to answer questions now without the presence of an attorney, you have the right to stop answering these questions at any time, O.K.? Do you understand, do you understand the rights? Yes? Yes? O.K.

(Ellipses in original). Immediately after being asked: "Do you understand, do you understand the rights? Yes? Yes?", Madrid responded in the affirmative.

In advising Madrid of his rights, Detective Cruz provided all of the advisements that the Supreme Court required under Miranda in Spanish, Madrid's first language. Unlike Madrid, we do not see as problematic the circumstance that Detective Cruz orally advised Madrid of his rights in Spanish instead of allowing Madrid to read his rights on a written form. An officer is not required to Mirandize a juvenile in writing—indeed, in Miller, 251 Md. at 365-67, 247 A.2d at 532; Michael C., 442 U.S. at 710-11; McIntyre, 309 Md. at 609, 526 A.2d at 31; and Darryl P., 211 Md. App. at 164-65, 63 A.3d at 1172-73, the officers provided oral advisements of the rights under Miranda, as Detective Cruz did in this case. In addition, at the suppression hearing, Madrid's counsel agreed that a law enforcement officer may choose to give or not give Miranda rights in written form.

Madrid cites Miller, Michael C., McIntyre, and Darryl P. for the proposition that, beyond reading him his rights, Detective Cruz was required to but failed to assess whether he understood his rights and the consequences of waiving them. Madrid bases this argument, in part, on the circumstance that, unlike the officer in Darryl P., Detective Cruz

- 42 -

did not solicit a verbal response from Madrid after each advisement. Madrid also finds significant that the officer in Michael C. asked the juvenile whether he wanted to talk to the officers without counsel, whereas Detective Cruz asked Madrid: "Do you understand, do you understand the rights? Yes? Yes?"

We do not share Madrid's view that the distinctions he raises between this case and Darryl P. and Michael C. indicate that he did not understand his rights or knowingly and voluntarily waive them. No case law, including the cases cited by Madrid, holds that for a Miranda waiver to be given knowingly and voluntarily an officer interviewing a juvenile is required to obtain a specific response from the juvenile after each advisement or expressly re-ask certain questions to confirm the juvenile's waiver of rights. Rather, case law uniformly requires that a determination as to voluntariness be based on the totality of the circumstances of the case. In fact, in Michael C., 442 U.S. at 725, the Supreme Court specifically stated that the "totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." Although there are cases in which law enforcement officers have asked juveniles more explicit questions concerning the ability to understand and waive Miranda rights, in determining whether a waiver is made knowingly and voluntarily, this Court and the Supreme Court have consistently endorsed a totality of the circumstances approach. Under the totality of the circumstances in this case, the record demonstrates that the Miranda advisement was adequate and that Madrid understood his rights. Tellingly, Madrid did not testify at the suppression hearing that he did not understand his rights. Rather, Madrid testified that he did not remember being advised of his Miranda rights even

- 43 -

though the recording plainly showed that Detective Cruz gave the <u>Miranda</u> advisement and Madrid responded that he understood his rights.  As the Court of Special Appeals determined:

> Madrid gave no indication in the recording that he was confused or did not understand anything Detective Cruz had explained to him.  Madrid replied in the affirmative when Detective Cruz asked him if he understood the rights that had just been read to him.  And, in the answers Madrid gave to questions posed immediately before and immediately after the *Miranda* advisement, Madrid responded appropriately, giving no indication that he was having any difficulty understanding the detective's statements.

<u>Madrid</u>, 247 Md. App. at 717, 239 A.3d at 784.

In addition, in <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 384 (2010), the Supreme Court made clear that a defendant's waiver of <u>Miranda</u> rights can be implicit, stating:

> The prosecution [] does not need to show that a waiver of *Miranda* rights was express.  An implicit waiver of the right to remain silent is sufficient to admit a suspect's statement into evidence. . . . [A] waiver of *Miranda* rights may be implied through the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.

(Cleaned up).  In <u>Berghuis</u>, 560 U.S. at 375, 387, where a defendant did not expressly state whether he wanted to remain silent or wanted an attorney, the Supreme Court held that the defendant waived his right to remain silent by responding to a detective's question.  After being Mirandized, the defendant was interviewed for three hours and was mostly silent aside from occasionally responding "'yeah,' 'no,' or 'I don't know.'"  <u>Id.</u> at 375-76.  Toward the end of the interview, the defendant responded "Yes" to a detective's question: "Do you pray to God to forgive you for shooting that boy down?"  <u>Id.</u> at 376.  The Supreme Court determined that it was undisputed that the defendant understood his rights, that the defendant's answer to the detective's question about praying for forgiveness was a

course of conduct indicating waiver of the right to remain silent, and that there was no evidence that his statement was coerced. See id. at 385-86.

In this case, Detective Cruz's statements that Madrid was in the country unlawfully and that he was in danger from gangs did not render Madrid's waiver of his rights under Miranda involuntary. To be sure, Detective Cruz told Madrid that he knew of his immigration status and that Madrid may have been in danger from the MS-13 and 18th Street gangs. Detective Cruz did not state or imply, however, that Madrid would receive any kind of assistance or benefit if he confessed, or that he would receive more severe treatment if he did not waive his rights and refused to make a statement. Far from being coercive, Detective Cruz's remarks about Madrid's immigration status and the danger that MS-13 and 18th Street posed conveyed accurate information—Madrid had constitutional rights, regardless of his immigration status and, as he already knew, he may have been in danger from the gangs. As the Court of Special Appeals pointed out, Detective Cruz made accurate statements of fact reflecting that, indeed, Madrid was an undocumented immigrant and that the MS-13 and 18th Street gangs could pose a risk of danger. See Madrid, 247 Md. App. at 722, 239 A.3d at 787.

It is also accurate that Detective Cruz stated: "I can play this game with you all night if you want, but I'm not in that kind of, of, of, I don't wanna waste time, understand?" The circuit court found, however, that that was "a statement that, look, we are not going to be here all night. You either talk or you don't talk. It's really up to you." Like the Court of Special Appeals, we discern no improper inducement in this statement, and see no basis on

which to conclude that the circuit court's finding of fact is clearly erroneous.[10]  See id. at 722, 239 A.3d at 787.  Based on our review of the record, applying the totality of the circumstances test, we are satisfied that the record demonstrates by a preponderance of the evidence that Madrid's waiver of his rights under Miranda was both knowing and voluntary.

Having addressed the Miranda waiver issue, we next conclude that Madrid's confession was voluntary under the common law of Maryland, the Due Process Clause, and Article 22.  As to the common law of Maryland, we hold that the first prong of the Hillard test is not satisfied—i.e., the transcript of the interview does not establish that Detective Cruz promised or implied to Madrid that he would receive "special consideration from a prosecuting authority or some other form of assistance in exchange for [a] confession[.]"  Lee, 418 Md. at 161, 12 A.3d at 1253 (citation omitted).  Certainly, Detective Cruz referred to the danger that Madrid may have been in from the MS-13 and 18th Street gangs, but Detective Cruz at no time suggested that Madrid would receive any kind of assistance or that his circumstances would otherwise change in any way if he confessed.  The first prong of the Hillard test  involves "an objective" inquiry that does not depend on "a suspect's subjective belief that he or she will be advantaged in some way by

---

[10]Nor are Detective Cruz's statements—"I'm gonna advi[s]e you of your rights ah, then we're gonna get into why you're here right now, understand?" and "That's something you can tell me, were you threatened or what?  Or did you want to do this, what was it?"— coercive.  Detective Cruz's statement that "we're gonna get into why you're here right now, understand?" in no way indicated that Madrid was required to waive his rights. Similarly, Detective Cruz's question about why Madrid participated in the murder and attempted murder does not demonstrate that he failed to properly advise Madrid of his Miranda rights or improperly induced Madrid to waive his rights.

confessing[.]" <u>Winder</u>, 362 Md. at 311, 765 A.2d at 116 (citations omitted). In short, in addressing the first prong of the <u>Hillard</u> test, we, like the Court of Special Appeals, conclude that Detective Cruz's statements about MS-13 and 18th Street gangs do not constitute evidence, express or implied, of a promise of special consideration or an offer of any assistance. <u>See</u> <u>Madrid</u>, 247 Md. App. at 725, 239 A.3d at 789.

Because the first prong of the <u>Hillard</u> test is not satisfied, we need not address the second prong of the <u>Hillard</u> test, which is satisfied where "the suspect makes a confession in apparent reliance on the police officer's explicit or implicit inducement." <u>Lee</u>, 418 Md. at 161, 12 A.3d at 1253 (citation omitted). In fact, we are unable to address the second prong of the <u>Hillard</u> test even if we were inclined to do so, as Detective Cruz did not make an explicit or implicit inducement in the first place. Like the Court of Special Appeals, though, we observe that Madrid did not testify that he confessed because of anything Detective Cruz did or said.[11] <u>See</u> <u>Madrid</u>, 247 Md. App. at 720-21, 239 A.3d at 786.

Next, we address whether the State has proven by a preponderance of the evidence that Madrid's confession was voluntary under the Due Process Clause and Article 22. As explained earlier, the Supreme Court has prohibited confessions that result from police conduct that overbears the will of the defendant. <u>See</u> <u>Fulminante</u>, 499 U.S. at 303. In assessing the voluntariness of a confession, the totality of the circumstances test applies

---

[11]The Court of Special Appeals noted that Madrid did not testify that Detective Cruz's references to the danger that he was in from MS-13 and 18th Street induced him to confess. <u>See</u> <u>Madrid</u>, 247 Md. App. at 712, 239 A.3d at 781. The absence of such testimony would support the conclusion that Madrid did not confess in reliance on the alleged implicit inducement, *i.e.*, the second prong of the <u>Hillard</u> test is also not satisfied.

and we consider factors this Court set forth in Hof, 337 Md. at 596-97, 655 A.2d at 377-78, as well as factors for defendants who were juveniles at the time of an interview that this Court set forth in Moore, 422 Md. at 531-32, 30 A.3d at 954-55. While "care must be taken to assure that statements made to the police by juveniles are voluntary before being permitted in evidence[,]" id. at 531, 30 A.3d at 954 (citation omitted), "the age of a [defendant], in itself, does not render a confession involuntary[,]" Miller, 251 Md. at 379, 247 A.2d at 539 (citations omitted). Because Article 22 is read *in pari materia* with the Self-Incrimination Clause, this Court has held that both Federal and State constitutional requirements are satisfied if the defendant's confession is not the product of "police conduct that overbears the will of the suspect and induces the suspect to confess." See Lee, 418 Md. at 159, 12 A.3d at 1252 (citing Fulminate, 499 U.S. at 288; Connelly, 479 U.S. at 167; Spano, 360 U.S. at 323).

We conclude that the totality of the circumstances test results in a determination that Madrid's statement was voluntary under the Due Process Clause and Article 22, *i.e.*, Madrid's confession was not the result of police conduct that overbore his will and induced him to confess. See Lee, 418 Md. at 159, 12 A.3d at 1252. The record paints a picture of Madrid as a self-sufficient young man who, despite being a minor, was working, earning money, and using half of his pay to help support his mother. Madrid engaged in conversation with Detective Cruz, indicated that he understood his rights, and verbally responded to Detective Cruz's questions. The circumstance that Madrid confessed only twenty minutes after the interview began establishes that he was not subject to an impermissible lengthy interrogation and did not require much questioning before

confessing. Although Madrid has indicated that he was "disoriented" and did not speak during the advisement, the record indicates that Madrid stated that he understood his rights and answered Detective Cruz's questions before and after the <u>Miranda</u> advisement.

In sum, the record demonstrates that Madrid knowingly and voluntarily waived his rights under <u>Miranda</u> and his confession was voluntary under the common law of Maryland, the Due Process Clause, and Article 22. Accordingly, the circuit court was correct in denying the motion to suppress.

## II. Jury Instruction on Duress

### The Parties' Contentions

Madrid contends that the Court of Special Appeals erred in holding that he failed to meet the "some evidence" standard for generating the defense of duress and that there was ample evidence that he reasonably feared imminent death or serious bodily injury if he did not comply with the order from the higher-up in MS-13. In addition, Madrid asserts that whether he is precluded from asserting the defense because the alleged compulsion, *i.e.*, duress, arose due to his own fault, negligence, or misconduct was a matter for the jury to determine.

The State responds that the circuit court was correct in declining to give a jury instruction on duress because there was no evidence of imminent harm. The State points out that, although Madrid testified that he would have been punished "as soon as possible"—*i.e.*, "[t]he following day"—if he did not comply with the order, this did not constitute evidence of imminent harm. In addition to asserting that there was no present, immediate, and impending threat, the State argues that Madrid was not entitled to a jury

instruction on duress because, as the circuit court and the Court of Special Appeals determined, by joining the MS-13 gang, he voluntarily placed himself in a situation in which he would likely be subject to coercion and thus may not assert the defense of duress.

**Standard of Review**

An appellate court reviews without deference a trial court's determination as to whether there was enough evidence to generate a jury instruction. See Howell v. State, 465 Md. 548, 561, 214 A.3d 1128, 1136 (2019).

**Jury Instruction on Duress**

Maryland Criminal Pattern Jury Instruction ("MPJI-Cr") 4:17.5C is entitled "Voluntary Manslaughter (Duress)" and states:

> Voluntary manslaughter is an intentional killing, which would be murder, but is not murder because the defendant acted under duress. This does not result in a verdict of not guilty, but rather reduces the level of guilt from murder to manslaughter. You have heard evidence that the defendant killed (name) under duress. In order to convict the defendant of murder, the State must prove that the defendant did not act under duress. If the defendant did act under duress, the verdict should be guilty of voluntary manslaughter and not guilty of murder.
>
> Killing under the influence of an overpowering force is a mitigating circumstance. This is called duress. In order for this mitigating circumstance to exist in this case, the following four factors must be present:
>
> > (1) the defendant actually believed that the duress placed [him] [her] in immediate or imminent danger of death or serious bodily harm;
> >
> > (2) the defendant's belief was reasonable;
> >
> > (3) the defendant had no reasonable opportunity for escape; and
> >
> > (4) the defendant killed the victim because of the duress.
>
> In order to convict the defendant of murder, the State must prove that the

mitigating circumstance of duress was not present in this case. This means that the State must persuade you, beyond a reasonable doubt, that at least one of the four factors of duress was absent. If the State has failed to persuade you that at least one of the four factors was absent, you cannot find the defendant guilty of murder, but may find the defendant guilty of voluntary manslaughter.

In order to convict the defendant of murder, the State must prove that the defendant did not act under duress. If the defendant did act under duress, the verdict should be guilty of voluntary manslaughter and not guilty of murder.

(Brackets and underlining in original). The "Notes on Use" for MPJI-Cr 4:17.5 state in pertinent part: "Use this instruction if the defendant is charged with first degree premeditated murder . . . , second degree specific intent murder . . . , and/or voluntary manslaughter . . . , but only if there is an issue of mitigation generated by evidence of duress."

The Comment to MPJI-Cr 4:17.5 states in pertinent part:

A complete defense of duress, when applicable, requires that the defendant commit a crime because he or she honestly and reasonably believed that he or she was in imminent danger of death or serious bodily harm if he or she did not commit it, and that he or she had no reasonable opportunity to escape.
Unlike self-defense and defense of others, both of which can serve as either a perfect or imperfect defense, duress cannot serve as a complete defense to both murder and manslaughter. As a matter of policy, the defense of duress is not available to excuse intentional murder, attempted murder, or assault with intent to murder. However, as with self-defense and defense of others, duress can serve as an imperfect defense, which although not a complete defense, can negate the malice and thus mitigate murder to voluntary manslaughter.

(Citations omitted).

**Case Law on Duress**

In <u>Howell</u>, 465 Md. at 551, 214 A.3d at 1130, this Court set forth the following

- 51 -

standard for the defense of duress:

> To constitute a defense, the duress by another person on the defendant must be present, imminent, and impending, and of such a nature as to induce well grounded apprehension of death or serious bodily injury if the act is not done. It must be of such a character as to leave no opportunity to the accused for escape. Mere fear or threat by another is not sufficient nor is a threat of violence at some prior time. The defense cannot be raised if the apprehended harm is only that of property damage or future but not present personal injury. The defense cannot be claimed if the compulsion arose by the defendant's own fault, negligence or misconduct.

(Quoting McMillan, 428 Md. at 348-49, 51 A.3d at 632) (cleaned up).

In Williams, 101 Md. App. at 414-25, 646 A.2d at 1104-10, the Court of Special Appeals discussed various authorities on the defense of duress, including federal cases, cases from other States, and secondary sources, and held "that where an actor recklessly (as defined in § 2.02 of the Model Penal Code) places himself or herself in a situation where it is probable that he or she would be subjected to duress, the defense of duress is unavailable." In turn, Model Penal Code § 2.02(2)(c) defines "recklessly" as follows:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

The circumstances in Williams, 101 Md. App. at 411, 646 A.2d at 1103, involved the defendant's participation in an attempted robbery with three other men. At the time of the attempted robbery, the victim, who was at home, heard a knock on the front door, looked through the keyhole, and saw the defendant on the other side. See id. at 411, 646 A.2d at 1103. The victim partially opened the door, and the defendant and three other men

rushed inside.  See id. at 411, 646 A.2d at 1103.

One of the other men held the victim at gunpoint, and one demanded that the victim tell them where "the money" and "the dope" were.  Id. at 411, 646 A.2d at 1103.  The defendant repeatedly told the three other men that that he and the victim were friends, that he and the victim had used drugs in the victim's home the previous day, and that there were still drugs in the victim's home.  See id. at 411, 646 A.2d at 1103.  After an unsuccessful search for drugs in the victim's home, the three other men forced the defendant to kneel next to the victim and demanded that he and the victim tell them where "the money" and "the dope" were.  Id. at 411, 646 A.2d at 1103.  Ultimately, the victim was tied up, and the defendant and the three men left the victim's home without taking anything.  See id. at 412, 646 A.2d at 1103.

At a bench trial, the defendant testified that he borrowed money from a drug dealer's brother and made drug runs to New York for the drug dealer.  See id. at 410, 412, 646 A.2d at 1102, 1103.  The three men who participated in the attempted robbery were former members of the drug dealer's organization, knew about the defendant's relationship with the drug dealer, and believed that the defendant knew the location of the drug dealer's stash house.  See id. at 412, 646 A.2d at 1103.  The three men kidnapped the defendant and threatened to kill him if he did not tell them where the drug dealer's stash house was.  See id. at 412, 646 A.2d at 1103.  The defendant led the three men to the victim's home, told them that it was the drug dealer's stash house (it was not), and knocked on the front door.  See id. at 412, 646 A.2d at 1103.

The Court of Special Appeals concluded that the trial court correctly determined

that the defense of duress did not apply because the defendant's "prior conduct contributed

mightily to the predicament in which he later found himself[.]" Id. at 425-26, 646 A.2d at

1110. The Court of Special Appeals explained:

> [The defendant] voluntarily became involved with the [drug dealer's]
> organization. It is unrefuted that [the defendant] borrowed money from [the
> drug dealer's brother]. Because of his inability to repay promptly, [the
> defendant] allegedly was forced to make the first drug run up to New York.
> He also participated in another drug run. In other words, the evidence does
> not suggest that he was forced to make these runs, he did this of his own
> volition to help pay off his debt. By becoming involved with this drug ring,
> [the defendant] through his own recklessness made others aware of his
> connection with [the drug dealer], including his abductors. [The defendant]
> was readily identifiable to those in the organization, including his abductors,
> and the abductors acted accordingly. This was a situation that would not
> have occurred but for [the defendant]'s association with the drug
> organization.

Id. at 426, 646 A.2d at 1110.

In McMillan, 428 Md. at 363, 51 A.3d at 641, this Court held that a trial court erred

in not giving a jury instruction on duress. McMillan, id. at 340, 51 A.3d at 627, arose out

of the defendant's participation in the murder of a victim who was found bludgeoned to

death by a baseball bat in his home with the word "Crips" spray-painted on a nearby wall.

More than a decade before the victim's death, he and the defendant had been next-door

neighbors for two years. See id. at 340, 51 A.3d at 627. After the victim's death, while

being interviewed by law enforcement officers, the defendant said that two of his

acquaintances, "S.O." and "Vel," came to his workplace and told him that they would give

him a ride home. Id. at 340-41, 362, 51 A.3d at 627, 640. This Court noted that S.O. and

Vel were "identified gang members" with a "known criminal history[.]" Id. at 356-57, 51

A.3d at 637. Once in the car, when the defendant noticed that they were not driving toward

his home, S.O. told the defendant that they were going to the town where the victim lived so that the defendant could knock on the victim's door. See id. at 341, 51 A.3d at 627. The defendant said that he did not want anything to do with a robbery. See id. at 341, 51 A.3d at 627. S.O. responded: "[I]t's GBA [guilt by association], you get down or you lay down, you gonna be with that old man in the house or you gonna leave out the house with us, which one you wanna do?" Id. at 341, 51 A.3d at 627 (second alteration in original). During the interview, one of the officers asked: "If you didn't do it, you'd probably be dead right now, don't you think?" Id. at 341, 51 A.3d at 628. The defendant responded: "I probably be dead because they killing everybody." Id. at 341, 51 A.3d at 628. The defendant told the officers "that he was 'forced to go get the door open,' that he was 'compelled' to open the door, and that if he refused, he would be killed." Id. at 341, 51 A.3d at 628.

We concluded that the defendant's statements to the officers were sufficient to generate the jury instruction on duress. See id. at 362, 51 A.3d at 640. We determined that the defendant's statements constituted "'some evidence' that he believed reasonably that he was in danger of immediate or impending death or bodily harm if he did not participate in the robbery." Id. at 362, 51 A.3d at 640. We explained that the defendant did not need to be at gunpoint or otherwise threatened with weapons to have such a reasonable belief. See id. at 356, 51 A.3d at 637. We held that a jury could infer from

> threats by identified gang members, such as S.O. and Vel, when no weapons
> are displayed or when there are no weapons, that the defendant had a "well-
> grounded apprehension of death or serious bodily injury." Indeed, in this
> case, without bringing a weapon to the robbery, S.O. and Vel were able
> nonetheless to bludgeon the victim to death brutally.

Id. at 356, 51 A.3d at 637.

We were unpersuaded by the State's contention that there was no evidence regarding how S.O.'s and Vel's alleged threat to the defendant might be carried out. See id. at 356-57, 51 A.3d at 637. We noted that "[t]hose who coerce others to participate in a crime or other activities need not, and rarely will, provide details of their coercive methods or intentions." Id. at 357, 51 A.3d at 637. We determined that the defendant's statements to the officers constituted "'some evidence' that he had no reasonable opportunity to escape before knocking on the victim's door." Id. at 362, 51 A.3d at 640. We explained:

> We do not require that the [defendant] make a "mad dash" to escape in the space and time between when the SUV was parked and when he knocked on the victim's door in order to prove that an escape route was not reasonable. The question of the reasonableness of the fear in a particular situation is one for the jury to weigh.

Id. at 362-63, 51 A.3d at 640-41.

In contrast, in Howell, 465 Md. at 551, 214 A.3d at 1130, this Court held that there was insufficient evidence to generate the defense of duress. The defendant was charged with criminal contempt based on his refusal to testify at a murder trial. See id. at 550, 214 A.3d at 1130. At a bench trial, the parties presented the trial court with a document including an agreed statement of facts and a proffer of testimony that the defendant would have elicited if he had called witnesses. See id. at 559, 214 A.3d at 1135. The defendant proffered that he would have testified that he refused to testify at the murder trial out of fear for his safety. See id. at 559, 214 A.3d at 1135. The defendant proffered that another witness would have testified that, on the first of the two days that the defendant was called

- 56 -

as a witness at the murder trial, multiple people attacked the defendant outside the courtroom, called him a "snitch[,]" and the people were escorted out of the courthouse without being arrested. See id. at 560, 214 A.3d at 1135. The defendant proffered that a correctional officer would have testified that, later on the same day, there was an attack on the defendant in jail. See id. at 560, 214 A.3d at 1135.

This Court concluded that the defendant failed to proffer some evidence of a "present, imminent, and impending" threat. Id. at 566, 214 A.3d at 1139. This Court explained that "[e]ach of those adjectives, according to its common dictionary definition, connotes simultaneity, or something close to it." Id. at 564, 214 A.3d at 1138 (footnote omitted). This Court explained that, although the defendant "may indeed have feared that someone might retaliate against him in some way sometime in the future for testifying[,]" "the threat was of future but not present personal injury"—i.e., the threat "was not immediate as required for the duress defense." Id. at 565-66, 214 A.3d at 1138-39 (cleaned up).

**Analysis**

Here, we conclude that the circuit court correctly determined that a jury instruction on duress was not generated by the evidence. As in Howell, 465 Md. at 566, 214 A.3d at 1139, there was no evidence of a "present, imminent, and impending" threat. Moreover, as a participant in the activities of the MS-13 gang or a gang member, Madrid voluntarily or recklessly placed himself in a position where it was reasonably foreseeable that he would be subject to coercion and is therefore not entitled to a jury instruction on duress.

We first address the lack of evidence of a present, imminent, and impending threat.

- 57 -

Madrid's testimony demonstrated that the threat to him was not present, immediate, or impending. At trial, after being asked: "[W]hen somebody in MS-13 commits a gang infraction, how quickly do they get punished?", Madrid responded: "That I know of, as soon as possible. The following day. As soon as it could possibly be done." Like the defendant who refused to testify at the murder trial in Howell, 465 Md. at 565-66, 214 A.3d at 1138-39, Madrid "may indeed have feared that someone might retaliate against him in some way sometime in the future" for failing to follow the order, but "the threat was of future but not present personal injury"—*i.e.*, the threat was not immediate. (Cleaned up). Just as the defense of duress did not apply in Howell, the defense of duress does not apply here, where Madrid's testimony indicated that he may have been punished the following day if he did not comply with the order.

It is also significant that Madrid's testimony indicates that, when Delincuente telephoned him and gave him the order, he was outside the nightclub with Stuart, who was unarmed at the time. In other words, Madrid was outdoors, on foot, and not in the presence of any armed MS-13 member when he received the order that led to his participation in the offenses. These circumstances underscore the lack of evidence of any immediate threat to Madrid if he failed to comply with the order. By way of comparison, the defendant in McMillan, 428 Md. at 356, 51 A.3d at 637, was subject to an immediate threat because he was a passenger in a vehicle with two gang members, who threatened that he would be killed, when he was ordered to knock on the victim's front door. Here, Madrid was under

no such immediate threat.[12]

Our conclusion is based on the lack of immediacy of the threat to Madrid, not a lack of clarity in that threat. As we stated in McMillan, id. at 357, 51 A.3d at 637, "[t]hose who coerce others to participate in a crime or other activities need not, and rarely will, provide details of their coercive methods or intentions." As Madrid's trial counsel pointed out, it would be unrealistic to expect a gang leader, such as Delincuente, to conclude "every one of his orders with, 'or else, I will kill you[.]'" The problem is not that Delincuente did not expressly threaten to kill Madrid if he did not comply with the order to kill rival gang members. Instead, the problem is that, by Madrid's own account, the threat to him was not immediate—to the contrary, he might have expected punishment for noncompliance "the following day." Although we have no reason to doubt the genuineness of this threat of future punishment, our case law unequivocally provides that the defense of duress "cannot

_____

[12]Although this factor was not specifically addressed by the parties, we note that there was an absence of evidence that Madrid lacked a reasonable opportunity to escape. The testimony of Madrid and Detective Cruz shows that there was such an opportunity. According to Madrid's version of events, when Delincuente telephoned him and gave him the order, he was outside the nightclub with Stuart, who as mentioned was unarmed at the time. Madrid testified that he and Stuart ran from the nightclub to the apartment building where Tenorio-Aguirre lived, which was a distance of approximately one mile. As such, when he was ordered to kill Tenorio-Aguirre, Madrid was outdoors, on foot, a mile away from the area where the offense would take place, and not in the presence of an armed member of MS-13. Madrid plainly had a reasonable opportunity to escape.

Again, the differences between this case and McMillan illustrate why the defense of duress is unavailable here. The defendant in McMillan, 428 Md. at 362, 51 A.3d at 640, lacked a reasonable opportunity to escape because two gang members drove him to the victim's home. We explained that we would "not require that the [defendant] make a 'mad dash' to escape" his captors. Id. at 362, 51 A.3d at 640. By contrast, here, no such measure would have been necessary for Madrid to escape. Madrid needed only to refrain from running a mile with Stuart, who was unarmed, to Tenorio-Aguirre's apartment building, and attempting to murder him and murdering Nerio-Rico.

be raised if the apprehended harm is only that of . . . future but not present personal injury[.]" Howell, 465 Md. at 551, 214 A.3d at 1130 (quoting McMillan, 428 Md. at 348, 51 A.3d at 632).

If we were to adopt Madrid's position, which essentially is that evidence of membership in a gang that engages in retribution for a member's failure to follow orders generates the defense of duress, we would enlarge the standard for allowing the defense of duress to include scenarios where, as here, the defendant for fear of unspecified punishment sometime in the future, complied with an order to engage in criminal activity. In other words, as the circuit court observed, "every MS-13 gang member would be able to assert a duress defense according to [Madrid's] analysis, because that potential is always there for penalties if you don't obey an order." We decline to enlarge the standard for generating the defense of duress. Instead, we reaffirm the well-established principles set forth in our case law that, to assert the defense of duress, the defendant must be subject to a "present, imminent, and impending" threat rather than a future one, and must lack a reasonable opportunity for escape. Howell, 465 Md. at 551, 214 A.3d at 1130 (quoting McMillan, 428 Md. at 348-49, 51 A.3d at 632).

Given that the evidence failed to generate the defense of duress in this case because the threat was not "imminent," we need not necessarily determine whether as a matter of law the defense of duress is available to a defendant who places himself in a position to be subjected to coercion. We nonetheless exercise our discretion to reach the issue as it is an issue of importance that has been raised in the petition for writ of *certiorari* and briefed by the parties. As such, we address the question of whether Madrid intentionally or recklessly

placed himself in a situation where it was reasonably foreseeable that he would be subjected to coercion, and whether as a matter of law that circumstance renders the defense of duress unavailable. We answer both questions in the affirmative. In McMillan, 428 Md. at 348-49, 51 A.3d at 632, in discussing the defense of duress, we quoted Frasher v. State, 8 Md. App. 439, 449, 260 A.2d 656, 662 (1970), in which the Court of Special Appeals stated that "there appears to be accord that the defense [of duress] cannot be claimed if the compulsion arose by the defendant's own fault, negligence or misconduct." (Cleaned up). Likewise, in Howell, 465 Md. at 551, 214 A.3d at 1130, in discussing the definition of duress, we stated that the defense of duress "cannot be claimed if the compulsion arose by the defendant's own fault, negligence or misconduct." (Quoting McMillan, 428 Md. at 348-49, 51 A.3d at 632).

Prior to McMillan and Howell, in Williams, the Court of Special Appeals held that a defendant should not be permitted to assert the defense of duress where the defendant recklessly entered a situation in which it was probable that the defendant would be subjected to duress. See Williams, 101 Md. App. at 425, 646 A.2d at 1110. In Williams, id. at 424-25, 646 A.2d at 1109, the Court of Special Appeals addressed the question of whether duress is available where a defendant recklessly places himself in a situation in which it is probable that he would be subjected to coercion. In doing so, the Court reviewed various authorities, including 1 *Wharton's Criminal Law* § 52 (C.E. Torcia, 15th ed. 1993), which provides that "the defense of duress is not available if the defendant intentionally or recklessly placed himself in a situation in which it was reasonably foreseeable that he would be subjected to coercion." Williams, 101 Md. App. at 424-25, 646 A.2d at 1109,

(Cleaned up). The Court of Special Appeals also observed that Model Penal Code § 2.09, which defines duress, provides that the defense of duress "is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress." Williams, 101 Md. App. at 424, 646 A.2d at 1109.

Based on case law of this Court and the Court of Special Appeals, we determine that the defense of duress is unavailable as a matter of law to a defendant who voluntarily or recklessly placed himself in a situation in which it was reasonably foreseeable that the defendant could be subject to the coercive circumstances that the defendant contends constitute duress. The rationale underlying this determination is that a defendant who voluntarily or recklessly placed himself in a situation to be coerced has contributed to the circumstances that form the basis of the defense that the defendant claims should excuse the criminal conduct.

In this case, Madrid voluntarily associated himself with MS-13 and participated in the activities of MS-13, even though he was aware that he would be subject to "punishment" for the failure to follow orders, *i.e.*, coercion, and that an order could involve the commission of violent crimes. By participating in MS-13 gang activities, Madrid put himself in a situation in which it was reasonably foreseeable that he might be ordered to commit a crime and face punishment if he did not comply. By participating in MS-13 gang activities, it would have been reasonably foreseeable to Madrid that he might someday be ordered to engage in violent offenses such as murder and attempted murder. According to Sergeant Norris, the State's gang expert, an unofficial motto of MS-13 is "kill, rape and control." Beltran-Cazun, a member of MS-13 who participated in the murder and

attempted murder with Madrid, testified that, once they reach a certain rank, members of MS-13 are expected to kill rival gang members. When asked what members of MS-13 were supposed to do with members of 18th Street, Beltran-Cazun responded: "Kill them before they kill us."

Under these circumstances, it was reasonably foreseeable—indeed, inevitable—that, once Madrid joined or associated himself with MS-13, he would eventually be asked to move on from low-level criminal activity to more serious criminal activity, including murder. This case is on all fours with Williams, 101 Md. App. at 426, 646 A.2d at 1110, in that "[t]his was a situation that would not have occurred but for [the defendant]'s association with" a criminal organization. The defense of duress is unavailable to Madrid as a matter of law because he voluntarily placed himself in a situation in which it was reasonably foreseeable that he would be subject to the coercion that he now contends constitutes duress.[13]

_____

[13]Madrid attempts to distinguish Williams, 101 Md. App. at 410, 646 A.2d at 1102, on the ground that it involved a bench trial rather than a jury trial. Madrid contends that, where a defendant is tried by a jury and generates the defense of duress, the jury should be permitted to determine whether the defendant is precluded from asserting the defense of duress due to the defendant's own fault, negligence, or misconduct. We disagree. Just as a trial court determines whether the defendant has generated sufficient evidence to warrant the giving of an instruction on duress, the trial court determines whether the defense of duress is unavailable, as a matter of law, where, as here, the evidence establishes that the defendant voluntarily or recklessly placed himself in a situation where it was reasonably foreseeable that the defendant would be ordered to or forced to engage in the criminal activity with which the defendant was charged.

For all of the reasons set forth herein, the circuit court was correct in denying the request for a jury instruction on duress.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.**